UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BISSER NIKOLOV, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LIVENT CORPORATION, FMC CORPORATION, PAUL W. GRAVES, GILBERTO ANTONIAZZI, NICHOLAS L. PFEIFFER, PIERRE R. BRONDEAU, ANDREA E. UTECHT, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, GOLDMAN SACHS & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., LOOP CAPITAL MARKETS LLC, and NOMURA SECURITIES INTERNATIONAL, INC.,<br><br>Defendants. | Civ. Action No. 2:19-cv-02218-CFK<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

[CORRECTED] CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Lead Plaintiffs Central Laborers' Pension Fund and New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("Lead Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Livent Corporation ("Livent" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Livent; and (c) review of other publicly available information concerning Livent. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Livent common stock pursuant and/or traceable to the false and misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's October 2018 initial public offering ("IPO" or the "Offering"). Lead Plaintiffs pursue claims against the defendants under the Securities Act of 1933 (the "1933 Act"). The action asserts strict liability claims under §§11, 12 and 15 of the 1933 Act against Livent, certain Livent officers and directors, the underwriters of the IPO and Livent's controlling shareholder FMC Corporation ("FMC").

2. Livent is a pure-play miner and producer of lithium, and a leading producer of performance lithium compounds globally. Livent produces performance lithium compounds for sale and use in a variety of applications, including lithium hydroxide, its most lucrative product, that is used to produce batteries for electric vehicles ("EV").

3. As a vertically integrated producer, the Registration Statement highlighted Livent's ability to optimize profits through the cost effective management of the raw material (lithium carbonate) used in its lithium production process, which purportedly gave the Company an edge over its competitors. The Registration Statement also claimed that a majority of Livent's future revenues were secured by long-term contracts, thereby insulating the Company from pricing, volume and margin volatility. The Registration Statement further touted the Company's growth strategy as focused on its performance lithium compounds – battery-grade lithium hydroxide in particular – that it claimed was the choice product for battery manufacturers as EV adoption continued to rapidly accelerate.

4. In October 2018, defendants filed Livent's Registration Statement with the SEC in connection with issuing 23 million shares of Livent common stock to the investing public at $17.00 per share. Prior to the IPO, the Company was a subsidiary of defendant FMC. FMC spun off Livent in the IPO (the "Spin Off") and continued to control the Company after the IPO, owning over 84.25% of the shares of Livent's outstanding common stock. Unbeknownst to investors, the Registration Statement used by defendants to successfully raise money from the IPO was false and misleading as it omitted material facts, including:

(a) That the Company was experiencing shortages of internally produced lithium carbonate, which resulted in Livent being unable to keep up with customer demand and production supply required for its lithium hydroxide production. Due to these shortages, Livent was required to purchase higher volumes of lithium carbonate from third-party suppliers at higher costs, which negatively impacted the Company's revenues and margins;

(b) That a dispute between the Company and one of its largest third-party lithium carbonate suppliers had not effectively been resolved as represented in the Registration Statement,

but instead, was about to be terminated, which caused the Company to have to pay higher prices for its raw materials, thereby impacting revenues and margins;

(c) That Livent had entered into long-term contracts with its customers that contained pricing and volume terms that were not favorable to Livent and were negatively impacting the Company;

(d) That demand and pricing for the Company's performance lithium compounds were weakening as Livent's larger customers were delaying purchases of these products and moving to production processes that used lower-priced lithium products. These conditions at the time of the IPO resulted in lower pricing for Livent's performance lithium compounds; and

(e) That global supply of lithium compounds was growing faster than demand, which in turn was increasing competition and driving down lithium hydroxide prices in China. As a result, Livent's customers in China were not willing to enter into long-term contracts with Livent and the Company was unable to secure higher priced contracts with its Chinese customers.

5. Within just four months of the IPO, Livent released weaker than expected results for the fourth quarter of 2018 and provided disappointing guidance for the upcoming year. Specifically, on February 12, 2019, during Livent's 4Q 2018 earnings conference call, the Company told investors that 2019 margins would be negatively impacted by higher costs associated with the purchase of lithium carbonate from third-party suppliers. The Company further told investors that 1Q 2019 and full year 2019 earnings would be negatively impacted by customer mix due to unfavorable contract pricing and volume terms for some of Livent's lithium hydroxide customers. On the same call defendants disclosed that its customers in China were "paus[ing]" purchases and refusing to enter into annual or multi-year contracts with Livent due to production process issues and pricing concerns and as a result, sales in China, one of Livent's biggest markets, would be flat for 2019. On this

news, the Company's share price fell $0.57, over 4%, to close at $12.55 per share on February 12, 2019, on unusually heavy trading volume.

6. On May 8, 2019, the Company announced disappointing financial results for the first quarter of 2019 and drastically lowered 2019 guidance. During the earnings call, the Company disclosed that changing global original equipment manufacturer ("OEM") standards were necessitating further investments by its customers and as a result, these contracted customers were delaying their purchases of lithium hydroxide from Livent. Consequently, the Company was left with excess hydroxide volumes that would have to be sold under short-term contracts at a lower price. The Company disclosed that these short-term lower priced contracts, combined with an unfavorable customer mix, led Livent to lower its guidance for 2019. On this news, the Company's share price fell $1.70, nearly 16%, to close at $9.03 per share on May 8, 2019, on unusually heavy trading volume.

7. Utilizing the false and misleading Registration Statement, defendants successfully raised $369 million in net proceeds. The price of Livent stock was trading at less than half the IPO price as of the filing of this action.




8. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act.

11. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because defendants maintain offices in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

12. In connection with the acts, transactions and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

13. **Lead Plaintiff Central Laborers' Pension Fund** is an institutional investor established in 1965 that provides annuity and pension benefits to approximately 16,000 active and retired laborers and their beneficiaries throughout most of Illinois and has approximately $1 billion in assets under management. As reflected in its Certification (ECF Nos. 12-4, 12-5), the Central Laborers' Pension Fund purchased 58,862 shares of Livent common stock pursuant and/or traceable to Livent's October 2018 IPO and suffered a substantial loss as a result of the alleged violations of the federal securities laws in this action.

14. **Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund** is a multi-employer pension plan with approximately $1.7 billion in assets under management. The New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund has approximately 49,000 participants. As reflected in its Certification (ECF Nos. 12-4, 12-5), the New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund purchased 70,689 shares of Livent common stock pursuant and/or traceable to Livent's October 2018 IPO and suffered a substantial loss as a result of the alleged violations of the federal securities laws in this action.

15. **Defendant Livent** is incorporated under the laws of Delaware with its principal executive offices located in Philadelphia, Pennsylvania. Livent's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "LTHM."

16. **Defendant FMC** is a chemical manufacturing company located in Philadelphia, Pennsylvania. FMC is subject to liability as a seller and control person. As the parent company of Livent, FMC owned 100% of Livent's outstanding common stock as of the IPO, and held 84.25% of the Company's outstanding common stock after the IPO, having sold securities representing approximately 16% of its ownership interest in connection with the IPO. The Registration Statement identified FMC as Livent's "***Controlling Shareholder***" and listed numerous powers that FMC had over Livent, including the ability to "determine the outcome of all corporate actions requiring stockholder approval, including the election and removal of directors." At the time of Livent's IPO, Livent's board of directors had seven members, four of whom were also officers and directors of FMC, all of whom not only reviewed and approved the Registration Statement, but also participated in an IPO roadshow. FMC was motivated by the financial implications of the IPO, including (among other things) selling its interest in Livent and receiving proceeds from the IPO, transferring certain assets and liabilities, and being able to cause the issuance of marketable securities to further fund cash and securities into its capital structure.

17. **Defendant Paul W. Graves** ("Graves") is Livent's President, Chief Executive Officer and a director of the Company, and has held these positions since May 2018. Before the Spin Off, defendant Graves was FMC's Executive Vice President and Chief Financial Officer from October 2012 to May 2018. Defendant Graves signed or authorized the signing of the Company's Registration Statement filed with the SEC. He also reviewed and approved the IPO roadshow presentation, in addition to making statements in the roadshow intended to encourage investors to purchase shares in the IPO.

18. **Defendant Gilberto Antoniazzi** ("Antoniazzi") is Livent's Vice President and Chief Financial Officer, and has held these positions since May 2018. Before the Spin Off, defendant Antoniazzi was Chief Financial Officer of FMC's Agricultural Solutions business segment from 2013 to May 2018 and held various other positions with FMC since 1993. Defendant Antoniazzi signed or authorized the signing of the Company's Registration Statement filed with the SEC. He also reviewed and approved the IPO roadshow presentation, in addition to making statements in the roadshow intended to encourage investors to purchase shares in the IPO.

19. **Defendant Nicholas L. Pfeiffer** ("Pfeiffer") was Livent's Chief Accounting Officer from September 2018 to February 2019. At the time of the IPO defendant Pfeiffer was also FMC's Vice President and Chief Accounting Officer (since November 2015) and currently holds these positions at FMC. Defendant Pfeiffer signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20. **Defendant Pierre R. Brondeau** ("Brondeau") is Livent's Chairman of the Board of Directors and a director, and has held these positions since at least October 2018. At the time of the IPO, defendant Brondeau was also FMC's Chief Executive Officer and Chairman of the Board of Directors. Defendant Brondeau currently holds these positions at FMC, and has since January 2010 and October 2010, respectively. Defendant Brondeau signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21. **Defendant Andrea E. Utecht** ("Utecht") is a Livent director and has held this position since at least October 2018. At the time of the IPO, and currently, defendant Utecht also held the positions of FMC's Executive Vice President, Secretary and General Counsel. Defendant Utecht signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22. Defendants Graves, Antoniazzi, Pfeiffer, Brondeau, and Utecht are collectively referred to hereinafter as the "Individual Defendants."

23. **Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated** ("Merrill Lynch") served as an underwriter for the Company's IPO and a representative of the other underwriters, and one of the joint bookrunners of the IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

24. **Defendant Goldman Sachs & Co. LLC** ("Goldman Sachs") served as an underwriter for the Company's IPO and a representative of the other underwriters, and one of the joint bookrunners of the IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

25. **Defendant Credit Suisse Securities (USA) LLC** ("Credit Suisse") served as an underwriter for the Company's IPO and a representative of the other underwriters, and one of the joint bookrunners of the IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

26. **Defendant Citigroup Global Markets Inc.** ("Citigroup") served as an underwriter and co-manager for the Company's IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

27. **Defendant Loop Capital Markets LLC** ("Loop Capital") served as an underwriter and co-manager for the Company's IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

28. **Defendant Nomura Securities International, Inc.** ("Nomura Securities") served as an underwriter and co-manager for the Company's IPO, helping to draft and disseminate the Registration Statement, and solicit investors to purchase Livent securities issued pursuant thereto.

29. Defendants Merrill Lynch, Goldman Sachs, Credit Suisse, Citigroup, Loop Capital, and Nomura Securities are collectively referred to hereinafter as the "Underwriter Defendants."

30. Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

31. The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offering and received, collectively, approximately $21.5 million in fees. The Underwriter Defendants determined that in return for their share of the Offering, they were willing to merchandize Livent stock in the Offering. The Underwriter Defendants participated in a road show prior to the IPO during which they, and certain of the Individual Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

32. The Underwriter Defendants also demanded and obtained an agreement from Livent that the Company would indemnify and hold harmless the Underwriter Defendants from any liability under the federal securities laws. They also made certain that Livent purchased millions of dollars in directors' and officers' liability insurance.

33. Representatives of the Underwriter Defendants also assisted Livent and the Individual Defendants in planning the Offering and purportedly conducted an adequate and reasonable investigation into the business and operations of Livent, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Livent's financial condition, customer contracts and supply agreements and future business plans and prospects.

34. In addition to availing themselves of access to internal corporate documents, agents of the Underwriter Defendants, including their counsel, met with Livent's lawyers, management and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Livent stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Livent would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

35. As a result of the constant contact and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans, and the material misstatements and omissions contained in the Offering documents as detailed herein.

36. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and the relevant Offering documents, including to Lead Plaintiffs and the Class.

## SUBSTANTIVE ALLEGATIONS

### A. Background

37. Livent specializes in the production of performance lithium compounds, which are used as critical inputs for various performance applications, like EV, primary batteries, greases, pharmaceuticals, polymer and aerospace. One of Livent's biggest products is lithium hydroxide, which is a performance lithium compound used in the manufacturing of EV batteries. With 1.2 million EVs sold globally in 2017, the EV market is rapidly growing with 19.6 million annual vehicle sales expected through 2027 and 60.2 million annual sales expected by 2040. The

Registration Statement touted Livent's ability to take advantage of this rapidly expanding market through sales of its performance lithium compounds.

38. Given this growth in the EV market, the Registration Statement also highlighted the increasing demand for high nickel content cathode materials, materials that enable longer EV driving ranges. According to the Registration Statement, the demand for Livent's battery-grade lithium hydroxide would also increase because it served as a critical component in the production of high nickel content cathode materials. The Registration Statement claimed that "[a]s one of the leading producers of battery-grade lithium hydroxide for EV applications, [Livent] [is] well positioned to benefit from this growth."

39. As a vertically integrated producer, Livent produces base lithium compounds, like lithium carbonate and lithium chloride, which the Company uses in the production of its performance lithium compounds. The Registration Statement touted Livent's low cost operations, which are centered on an area rich with lithium mineral depositions in the Salar del Hombre Muerto in Argentina. The Registration Statement further noted that Livent's operations in Argentina were expandable, enabling Livent to increase its production of base lithium compounds to meet increasing demand. Although 12% of Livent's revenues are generated from the sale of base lithium compounds, Livent consumes almost all of the lithium carbonate it produces internally.

40. In addition to sourcing its own base lithium compounds from places like the Salar del Hombre Muerto in Argentina, Livent purchases lithium carbonate from other sources from time to time. According to the Registration Statement, Livent purchases lithium carbonate as a raw material from third parties because it has the operational flexibility to do so and it allows them to manage their production requirements and raw materials cost, thereby optimizing profitability for the Company. In 2016, Livent purchased 1.4 kMT (metric ton) of lithium carbonate from a third-party supplier, but did not purchase any lithium carbonate from a third-party supplier in 2017.

41. One of Livent's third-party suppliers is Nemaska Lithium Shawinigan Transformation Inc. ("Nemaska"), which is a subsidiary of Canada-based Nemaska Lithium Inc. According to the Registration Statement, Livent entered into a long-term supply agreement with Nemaska in October 2016 wherein Nemaska would provide lithium carbonate to Livent from its electrochemical plant, which is under construction. Under the long-term supply agreement, Livent prepaid $10.0 million to Nemaska for lithium carbonate in April 2017, with supply obligated to begin on April 1, 2019. Under the agreement Livent was to be provided with a yearly lithium carbonate supply of 8,000 MT for a total supply under contract of 28,000 MT.

42. According to the Registration Statement, Livent sells the majority of its products pursuant to long-term agreements at pre-negotiated prices, with the majority of its sales consisting of performance lithium compounds. In 2017, more than 60% of the Company's revenue was generated from customers with long-term agreements that ranged in length from one to more than five years long. 2018 continued this trend, with 58% of Livent's revenue for the six months ended June 30, 2018 generated from long-term customer agreements.

43. A substantial amount of Livent's total revenue comes from a small number of customers. In 2017, one customer accounted for 14% of its revenue and for the six months ended June 30, 2018, a different customer accounted for 10% of Livent's revenue. Livent's ten largest customers accounted for 45% of their revenue in 2017 and 51% of their revenue for the six months ended June 30, 2018.

44. Livent's annual revenue grew from $264.1 million in 2016 to $347.4 million in 2017, with an annual growth rate of 32%. Livent's revenue was $210.7 million for the six months ended June 30, 2018, a growth rate of 51% as compared to the six months ended June 30, 2017. The Registration Statement also touted Livent's "highly profitable business," with "net income of $47.1 million, $42.2 million and $70.2 million, cash from operating activities of $51.0 million, $58.3

million and $18.0 million, and Adjusted EBITDA of $74.8 million, $126.1 million and $94.5 million in 2016, 2017 and the six months ended June 30, 2018, respectively."

**B. Livent's False and Misleading Registration Statement**

45. On October 1, 2018, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective on October 10, 2018.

46. On October 12, 2018, the Company filed its prospectus on Form 424(b)(1) with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 23 million shares of common stock at a price of $17.00 per share. The Company received proceeds of approximately $369 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used to make a distribution to FMC and to fund origination fees associated with Livent's revolving credit facility.

47. Following the IPO, FMC owned 84.25% of Livent's outstanding common stock.

48. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, including:

(a) That the Company was experiencing shortages of internally produced lithium carbonate, which resulted in Livent being unable to keep up with customer demand and production supply required for its lithium hydroxide production. Due to these shortages, Livent was required to purchase higher volumes of lithium carbonate from third-party suppliers at higher costs, which negatively impacted the Company's revenues and margins;

(b) That a dispute between the Company and one of its largest third-party lithium carbonate suppliers had not effectively been resolved as represented in the Registration Statement,

but instead, was about to be terminated, which caused the Company to have to pay higher prices for its raw materials, thereby impacting revenues and margins;

(c) That Livent had entered into long-term contracts with its customers that contained pricing and volume terms that were not favorable to Livent and were negatively impacting the Company;

(d) That demand and pricing for Company's performance lithium compounds were weakening as Livent's larger customers were delaying purchases of these products and moving to production processes that used lower-priced lithium products. These conditions at the time of the IPO resulted in lower pricing for Livent's performance lithium compounds; and

(e) That global supply of lithium compounds was growing faster than demand, which in turn was increasing competition and driving down lithium hydroxide prices in China. As a result, Livent's customers in China were not willing to enter into long-term contracts with Livent and the Company was unable to secure higher priced contracts with its Chinese customers.

### 1. The Registration Statement's False and Misleading Statements About Its Low Cost Manufacturing and the Nemaska Supply Agreement

49. The Registration Statement highlighted that Livent benefitted from its ability to internally produce low cost base lithium compounds for use in its production of performance lithium compounds, Livent's largest revenue producing products. The backbone of Livent's low cost operations is the Company's ability to source low cost lithium carbonate from its mining operations in Argentina, and in turn use the lithium carbonate to manufacture lithium hydroxide, its most profitable performance lithium compound. The Registration Statement stated in pertinent part:

> As a vertically integrated producer, we benefit from operating one of the lowest cost lithium mineral deposits in the world. We have been extracting lithium brine at our operations at the Salar del Hombre Muerto in Argentina for more than 20 years, and have been producing lithium compounds for over 60 years. . . . ***We source the majority of our base lithium compounds for use in the production of performance lithium compounds from these low cost operations in Argentina. Our***

> ***operations in Argentina are expandable, giving us the ability to increase our lithium carbonate and lithium chloride production to meet increasing demand***.

50. According to the Registration Statement Livent's "lithium hydroxide operations were the lowest cost globally in 2017" because:

> Lithium hydroxide producers [such as Livent] with access to low cost lithium bearing feedstock generally have an advantaged cost structure compared to producers sourcing from third parties. In addition, brine producers generally have a lower lithium hydroxide cost structure than hard rock mineral producers, due to their lower cost lithium carbonate feedstock.

51. The Registration Statement further highlighted that Livent's low-cost position would allow the Company to expand its production capacity for lithium carbonate and lithium hydroxide to meet growing demand, operate profitably across varying market conditions and generate attractive returns:

> In 2017 and for the six months ended June 30, 2018, we generated an Adjusted EBITDA margin of 36% and 45%, respectively. Our Adjusted EBITDA margin is a function of our low cost position. According to Roskill, in 2018 we operate the lowest cost lithium carbonate and lithium hydroxide operations globally. ***We believe this leading cost position allows our company to operate profitably across varying market conditions. The low-cost position we enjoy means that we can continue to invest in expanding our production capacity as demand grows and have confidence that we will generate attractive financial returns on our investments***.

52. In addition to internally sourcing its own low cost lithium carbonate, the Registration Statement stated that "***from time to time***" the Company purchased lithium carbonate from other sources and that Livent had the "***operational flexibility to procure lithium carbonate from third party suppliers as raw materials***," which allowed the Company "***to manage our production requirements and raw material cost, creating opportunities to optimize profitability***." However, the Registration Statement made clear that Livent "did not purchase any lithium carbonate in 2017 from third-party suppliers" and during the Company's IPO roadshow, Livent executives assured investors that the Company would not be short lithium carbonate in 2019.

53. Prior to the IPO, in October 2016, Livent entered into a long-term supply agreement with Nemaska to provide Livent with 8,000 MT per year of low cost lithium carbonate starting in April 2019, to help support Livent's lithium hydroxide production and expansion. In July 2018, the parties were in dispute over the supply agreement.

54. The Registration Statement, however, misleadingly gave the impression that the dispute over the supply agreement had been resolved at the time of the IPO with the parties agreeing to an amended and restated agreement:

> In October 2016, we entered into a long-term supply agreement (the "Agreement") with Nemaska Lithium Shawinigan Transformation Inc. ("Nemaska"), a subsidiary of Nemaska Lithium Inc. based in Quebec, Canada. Pursuant to the Agreement, Nemaska is to provide lithium carbonate to us from an electrochemical plant that is under construction. Since completion of the project financing has significantly delayed the construction of its electrochemical plant, Nemaska has reported that it is not in position to start delivering lithium carbonate according to the schedule in the Agreement.
>
> To enforce our right to supply under the Agreement, in July 2018, we filed for arbitration before the International Chamber of Commerce (in accordance with the Agreement's terms). In an attempt to resolve the dispute, the parties have been actively negotiating a revised schedule as well as arrangements to see that (in spec) lithium carbonate be nonetheless supplied to us from alternative sources under the responsibility of Nemaska, with a view to providing us with product while minimizing Nemaska's exposure until its electrochemical plant is in operation.
>
> ***On September 25, 2018, the parties agreed on the final wording of a draft amended and restated supply agreement and, accordingly, also agreed to suspend the arbitration process under the expectation that the parties will agree on arrangements regarding alternative supply sources in the very near future***.

55. The Registration Statement also discussed that as part of the Company's strategy to fully capitalize on the growing EV market, Livent had planned expansions for its internal production of both lithium carbonate and lithium hydroxide:

> In May 2016, we announced plans to increase our lithium hydroxide capacity to 30 kMT by the end of 2019. In February 2018, we announced our intention to expand our lithium hydroxide capacity to approximately 55 kMT by the end of 2025 at multiple locations. These expansions should ensure we have the capacity to meet customer demands globally, as they expand their own production networks around the globe.

***In addition, to support our lithium hydroxide expansion, we have announced plans to expand lithium carbonate production in Argentina from 15 kMT in 2017 to at least 60 kMT by the end of 2025, in four separate stages. We expect to consume substantially all of any incremental lithium carbonate produced internally or sourced externally in our lithium hydroxide operations***.

56. The Company's IPO roadshow presentation included a slide that detailed the four separate stages of the Company's production expansion plans, which started at the end of 2018.




57. The statements made by defendants above in ¶¶49-56 were false and misleading and omitted material facts, including:

(a) That the Company was experiencing shortages of internally produced lithium carbonate, which resulted in Livent being unable to keep up with customer demand and production supply required for its lithium hydroxide production. Before the Spin Off, Livent underinvested in lithium carbonate production capacity and at the time of the IPO was not on track to meet its lithium carbonate production plans. Despite these shortages the Company had made the decision to continue to supply a number of its lithium carbonate customers with the Company's Argentina produced

carbonate and as a result had insufficient feedstock for the Company's production of lithium hydroxide;

(b) Due to its shortage of lithium carbonate, Livent was required to purchase higher volumes of lithium carbonate from third-party suppliers at higher costs, which negatively impacted the Company's revenues and margins;

(c) The dispute between the Company and Nemaska regarding the lithium carbonate supply agreement was not effectively resolved as represented in the Registration Statement, but instead the supply agreement was about to be terminated; and

(d) During the supply agreement negations Nemaska had advised Livent that it might have no choice but to terminate the supply agreement, which the supply agreement expressly allowed Nemaska to do. As a result of the eminent termination, the Company would be forced to replace 8,000 MT per year of lithium carbonate at higher prices to meet its supply demand for the production of lithium hydroxide.

**2. The Registration Statement's False and Misleading Statements About Livent's Multi-Year Customer Contracts**

58. The Registration Statement emphasized that a significant number of the Company's customers entered into long-term contracts, which insulated the Company from pricing, volume and margin volatility. The Registration Statement claimed that these contracts gave the Company meaningful visibility into future production, demand, and revenue. The Registration Statement stated:

> Our customers demand very specific product performance characteristics, particularly from our battery-grade lithium hydroxide and butyllithium. Our products require a high level of manufacturing and technical expertise and undergo a stringent prequalification process before they are sold to customers. Our customers rely on our products for their high performance. ***For many we are one of only a few suppliers of performance lithium compounds, as many of our customers are unable or unwilling to adjust to alternate supply sources that may jeopardize the functionality of their end products and processes***.

> In 2017, we sold our lithium products to approximately 400 customers in approximately 37 countries, and approximately 77% of our sales were to customers outside of the United States. ***One customer accounted for approximately 14% of our total revenue in 2017***. Our ten largest customers accounted in aggregate for approximately 45% of our revenue in 2017.
>
> * * *
>
> ***In 2017 and for the six months ended June 30, 2018, more than 60% and approximately 58%, respectively, of our revenue was generated from customers with whom we have long-term agreements with terms ranging from two to more than five years in length, including all sales to our largest customer and nine of our ten largest customers***. A significant portion of the remaining 2017 sales were to customers with whom our relationship has not changed materially during the past five years. BEV automakers and battery and cathode manufacturers consider secure supply of high performance battery-grade lithium hydroxide as critical to their future success. These agreements generally specify an annual minimum purchase commitment at either a set price (usually reset annually) in a given year or within a pre-negotiated price range. ***For instance, approximately 79% of our expected lithium hydroxide production in 2019 is under contract, affording us meaningful visibility into future production demand and revenue***.

59. The Registration Statement also emphasized that a majority of the Company's future sales were secured with multi-year agreements, stating:

> We believe our consistent performance and our clear commitment to expanding production capacity have made us a preferred supplier in our target markets and have allowed us to secure multi-year supply agreements. ***In 2017 and for the six months ended June 30, 2018, more than 60% and approximately 58%, respectively, of our revenue was generated from customers with whom we have long-term agreements with terms ranging from two to more than five years in length. Our customers consider securing long-term committed supply of performance lithium compounds to be critical to their future success***. As our production of lithium hydroxide increases, we expect the portion of our total revenue generated under multi-year agreements to increase. ***We expect that all of our capacity expansions will be contracted with customers before we commence production***.

60. The statements made by defendants above in ¶¶58-59 were false and misleading and omitted material facts, including:

(a) One of the Company's largest lithium hydroxide customer contracts, that was in place for several years, was priced at a significantly lower rate than Livent's other contracted customers, and as a result, sales to this customer negatively affected revenues and margins;

(b) Livent was entering into long-term contracts with its customers that contained pricing terms that were not favorable to Livent and had the effect of lowering the average realized price of Livent's lithium hydroxide;

(c) Contrary to the statements in the Registration Statement, Livent's long-term contracts did not insulate the Company from pricing or volume volatility because under the terms of the agreements, Livent's customers had the ability to delay purchases and/or dictate volumes, which negatively impacted the Company's revenues and margins; and

(d) Livent customers with long-term contracts were in fact delaying purchases, which resulted in Livent having excess lithium hydroxide volumes that had to be sold under short-term agreements that were subject to price volatility.

### 3. The Registration Statement's False and Misleading Statements Concerning Weakening Product Demand and Pricing

61. The Registration Statement emphasized that Livent was "seeing the benefits of our strategy to grow our business in performance lithium compounds, where demand continues to accelerate and pricing trends across our portfolio remain favorable," and that the Company was well poised to take advantage of the rapidly growing EV market, stating:

> ***Automotive original equipment manufacturers ("OEMs") have announced plans to introduce longer-range EV models using higher energy density batteries, and are increasingly doing so by moving to high nickel content cathode materials. This shift will increasingly require battery-grade lithium hydroxide in the production of cathode materials***.
>
> As an existing, proven global producer of battery-grade lithium hydroxide, ***we are well positioned to benefit from this expected increase in lithium demand from EV growth***. As one of the pioneers in the lithium industry, we have relationships throughout the lithium-ion battery value chain. Across the battery value chain, product performance requirements have continued to evolve since the first lithium-ion batteries were introduced in the early 1990's. ***We have developed our application and materials knowledge by working with our customers over time to produce performance lithium compounds which meet evolving customer needs***.

62. The Registration Statement also stated that as one of leading producers of battery-grade lithium hydroxide for EV application, Livent would benefit from the increasing move by EV battery manufactures to the use of high nickel content cathodes, which required the type of performance lithium compound Livent produced:

> ***The growth forecasted in the EV market has resulted in a significant increase in current and expected future demand for battery-grade lithium compounds***. . . .
>
> As EV adoption accelerates, ***we anticipate battery manufacturers will increasingly move to using high nickel content cathode materials in the manufacture of EV batteries***. High nickel content cathodes substantially improve the energy density of batteries, enabling longer driving ranges. Battery-grade lithium hydroxide is a critical component in the production of high nickel content cathode materials. According to Roskill, demand for battery-grade lithium hydroxide for use in EV applications is expected to grow at a CAGR of 44% through 2027, reaching 359 kMT when measured on a lithium carbonate equivalent ("LCE") basis.
>
> ***As one of the leading producers of battery-grade lithium hydroxide for EV applications, we are well positioned to benefit from this growth***.
>
> * * *
>
> Our goal is to maintain a leading market share in battery-grade lithium hydroxide, butyllithium and high purity lithium metal. ***For high nickel content cathode materials, we believe we are one of a small number of producers capable of consistently delivering battery-grade lithium compounds that meet performance standards demanded by our customers***.

63. The Registration Statement also emphasized Livent's opportunities for economic growth in the fast growing Asia Pacific market, which included China, where over half of global demand for EVs existed at the time of the IPO:

> In recent years, the Asia Pacific region has become an important market for lithium and its influence on the global lithium products industry has been increasing. In 2017 and for the six months ended June 30, 2018, 59% and 62%, respectively, of our revenue was derived from sales to the Asia Pacific region. China currently comprises over half of global demand for EVs, and we expect demand for lithium products, particularly lithium hydroxide, will increase in the Asia Pacific region such that it remains the largest region in terms of consumption.

64. The Registration Statement also emphasized that the Company's "deep customer relationships" positioned Livent to capitalize on the accelerating trend of vehicle electrification and gave the Company "first-hand insight into [its] customers' production objectives" and needs:

> Our performance lithium compounds are frequently produced to meet specific customer application and performance requirements. We have developed our capabilities in producing performance lithium compounds through decades of interaction with our customers, and our products are key inputs into their production processes. ***Our customer relationships provide us with first-hand insight into our customers' production objectives and future needs, which we in turn use to further develop our products***.

65. The statements made by defendants above in ¶¶61-64 were false and misleading and omitted material facts, including:

(a) At the time of the IPO, the Company's cathode and battery customers, who purchased Livent's battery-grade lithium hydroxide at a premium prices, were undergoing modifications of their production processes to meet OEM standards and were delaying large scale production of high nickel content cathode materials that used Livent's battery-grade lithium hydroxide. As a result, these customers were delaying purchases from Livent;

(b) As a result of these conditions, Livent had excess lithium hydroxide volumes that could not be sold under existing contracts and instead had to be sold under short-term agreements at lower prices; and

(c) Livent customers were increasing their production of older cathode chemistries that had lower performance requirements than high nickel content cathode materials, and as such the prices for Livent's battery-grade lithium hydroxide were declining.

#### 4. The Registration Statement's False and Misleading Statements Concerning Competition and Lithium Supply

66. The Registration Statement highlighted Livent's competitive advantage based on the Company's "***significant know-how and experience in the lithium hydroxide . . . production processes and product applications***" and that Livent was "***one of a small number of producers capable of consistently delivering battery-grade lithium compounds that meet performance standards demanded by our customers***."

67. The Registration Statement also stated that Livent's goal was to "maintain a leading market share" in its performance lithium products, including battery-grade lithium hydroxide and with regard to the Company's competition, stated:

> Most markets for lithium compounds are global, with significant growth occurring in Asia, driven primarily by the development and manufacture of lithium-ion batteries. The market for lithium compounds also faces some barriers to entry, including access to an adequate and stable supply of lithium, technical expertise and development lead time. According to Roskill, we are one of six producers, including SQM, Albemarle, Tianqi, Orocobre and Jiangxi Ganfeng Lithium, that accounted for approximately 85% of the global supply of lithium compounds as measured by LCE. Both Albemarle and SQM recently entered into agreements with Chilean regulators to expand their annual lithium extraction efforts in Chile by an additional 135 kMT by 2021 and by 72 kMT by 2019, respectively. Tianqi recently announced an intention to invest an additional $525 million to expand its refining capabilities with the goal of quadrupling its annual output of lithium carbonate by 2021. Orocobre has announced that it is increasing production from its brine source in Argentina. We expect additional capacity to be added by new and existing producers over time. We believe our lithium brines in Salar del Hombre Muerto, Argentina, considered by the industry to be one of the lowest cost source of lithium, provide us with a distinct competitive advantage against these current or future entrants.
>
> We compete by providing advanced technology, high product quality, reliability, quality customer and technical service, and by operating in a cost-efficient manner. We believe we are a leading provider of battery-grade lithium hydroxide in EV battery applications and of performance greases and benefit from low production costs and a history of efficient capital deployment. . . . We are the only producer of high purity lithium metal in the Western Hemisphere and enjoy competitive advantages from our vertically integrated manufacturing approach and low production costs. Our primary competitors within the lithium metal product category include Jiangxi Ganfeng Lithium and other Chinese producers.

68. The statements made by defendants above in ¶¶66-67 were false and misleading because they omitted material information that at the time of the IPO the global supply of lithium compounds was growing faster than demand, which in turn was increasing competition and driving down lithium hydroxide prices in China. As a result, Livent's customers in China were not willing to enter into annual or multi-year contracts with Livent and the Company was unable to secure higher priced contracts with its Chinese customers. Similarly, the expansion of Livent's competitors' operations was adding to these market conditions and putting pricing pressure on Livent's performance lithium compounds, further impacting Livent's ability to secure higher priced contracts with its Chinese customers.

### 5. The Registration Statement's False and Misleading Risk Disclosures

69. The Registration Statement contained risk factors that failed to disclose and misrepresented significant risks the Company was facing at the time of Livent's IPO. For example, the Registration Statement stated that "[a]ny significant increase in raw materials costs from current levels could increase our cost of sales and have an adverse effect on our gross profit margins if we are unable to pass such price increases on to our customers"; and "[o]ur competitiveness and profitability are dependent in part upon our ability to control production costs, maintain efficient operations and make continuous improvements to enhance production efficiency." These statements were false and misleading and omitted material information. In truth, Livent was not producing sufficient amounts of lithium carbonate to meet production and sales demands without purchasing lithium carbonate from third-party suppliers at higher costs, which was negatively impacting the Company's revenues and margins. Further, the supply agreement with Nemaska for low cost lithium carbonate was about to be terminated, which would cause the Company to pay higher prices for raw materials. In addition, Livent failed to disclose that it had internally made the decision to continue to supply a number of its lithium carbonate customers with the Company's Argentina produced

carbonate and as a result was forced to purchase higher amounts of carbonate from third-party suppliers as feedstock for its lithium hydroxide production.

70. The Registration Statement also stated that "[l]ithium prices can be volatile" and "[w]e seek to manage volatility through . . . entering into long term contracts with our customers." These statements were false and misleading and omitted material information because one of the Company's largest customers had a contract priced significantly lower than Livent's other customers and as a result, sales to this customer were negatively impacting revenues and margins. Additionally, Livent had entered into contracts with its customers in Asia with pricing and volume terms that were not favorable to Livent and had the effect of lowering the average realized price of Livent's lithium hydroxide. Further, the Registration Statement failed to disclose that Livent's long term contracts allowed customers the ability to delay purchases and/or dictate volumes, and customers were in fact doing so, which negatively impacted the Company's revenues and margins.

71. Additionally, the Registration Statement stated that "our current business and prospects depend on the continued use and adoption of battery technologies that rely on performance lithium compounds" as a key component. This statement was false and misleading and omitted information because at the time of the IPO, the Company's cathode and battery customers, who purchased Livent's battery-grade lithium hydroxide at a premium prices, were delaying their purchases from Livent because they were undergoing modifications of their production processes to meet OEM standards and were delaying large scale production of high nickel content cathode materials that used Livent's battery-grade lithium hydroxide. As a result, Livent had excess lithium hydroxide volumes that could not be sold under existing contracts and instead had to be sold under short-term agreements at lower prices. Also, at the time of this IPO Livent customers were increasing their production of older cathode chemistries that had lower performance requirements

than high nickel content cathode materials, and as such the prices for Livent's battery-grade lithium hydroxide were rapidly declining.

72. With regard to competition, the Registration Statement's risk disclosures stated that "[i]f we fail to compete effectively, we may be unable to retain or expand our market share, which could have a material adverse effect on our business, results of operations and financial condition." This statement was false and misleading and omitted material information because at the time of the IPO the global supply of lithium compounds was growing faster than demand, which in turn was increasing competition and driving down lithium hydroxide prices in China. As a result, Livent's customers in China were not willing to enter into annual or multi-year contracts with Livent and the Company was unable to secure higher priced contracts with its Chinese customers.

**C. The Subsequent Disclosures**

73. On February 11, 2019, the Company reported that its fourth quarter 2018 financial results had missed top line sales targets, with the Company's sales and earnings forecasts for first quarter 2019 and full year 2019 falling short of analyst consensus targets.

74. On February 12, 2019, the Company held a conference call to discuss its fourth quarter 2018 financial results with analysts and investors. During the call, defendant Graves explained that difficulties negotiating customer contracts had contributed to the Company's disappointing results, stating:

> Before I turn to our 2019 guidance, I want to discuss how the year-end process for contract negotiations for 2019 played out. We saw price and volume increases in both our butyllithium and high performance lithium metal product lines reflecting Livent's strong position in these markets. ***Contracting for lithium hydroxide began in late 2018 and early verbal indications from customers suggested increases to volumes and stable to slightly higher prices across all regions. In particular, we saw significant increase in demand from customers in South Korea and Japan, reflecting the continued migration towards lithium hydroxide-based cathode technologies in these countries***.
>
> ***In China, however, it became apparent as we move through December and into January that our existing customers were not willing to enter into annual or***

> ***longer contractual commitments for lithium hydroxide at volumes or prices that they had [verbally] indicated to us just a few weeks earlier. In a number of cases, these customers abruptly halted their conversations with us unless we were willing to commit to prices that were lower than prices we were achieving elsewhere in the world***.
>
> . . . As of this time, however, it appears that customers in China have elected to delay their purchasing decisions until they have greater clarity on market conditions.
>
> * * *
>
> ***Put simply, a larger proportion of our lithium hydroxide volume will go to long-term, well-established and rapidly growing customers. This combined with some negative FX impact has the effect of lowering the average realized hydroxide price by roughly 50 cents per kilo***, even while 80% of our customers have committed to a price that is equal to or higher than the price they paid in 2018.

75. During the call, defendant Graves also explained that Livent needed to purchase lithium carbonate from third-party suppliers:

> However, given these developments we made the decision to continue to supply carbonate volumes in line with 2018 levels. ***As a result, we have entered into several contracts with lithium carbonate producers to supply carbonate to us in 2019 as feedstock***. More specifically, our plan is for all of this material to be used in the production of our lithium hydroxide in China. Our production experience allows us to purchase a reasonably wide range of lithium carbonate and manage our hydroxide operations to produce final product that meets required customer specifications. I would give more details on the pricing outcomes, our expected production and sales volumes, and ***the financial impacts of our contracting strategy in a moment***.
>
> * * *
>
> ***All of this means that we will need to augment our internal production with approximately 1,000 to 1,500 tons of third-party carbonate for use in our hydroxide units***. This use of third party carbonate is likely to be greatest in the first half of the year for the reasons set out above.
>
> * * *
>
> We also expect to have lower carbonate production in the first quarter as I mentioned earlier meaning that ***we will be using more of the purchased carbonate in both Ql and Q2*** ahead of higher Argentina operating rate in the second half of the year following additional debottlenecks.

76. Accordingly, defendant Graves confirmed that Livent's financials would be impacted, as Livent's "***higher cost from raw materials and VAT incurred due to higher exports out of China***

***act as a further headwind to 2019 Adjusted EBITDA***" and "***margins on the sale of lithium carbonate will be lower due to the higher cost of third-party purchases***."

77. Defendant Graves further disclosed the impact of one large customer contract:

> However, our Adjusted EBITDA is significantly impacted by the customer mix. ***This is predominantly due to one large lithium hydroxide contract that has been in place for several years and therefore has a much lower price than any of our other contracts, including other contracts with this same customer***. . . .
>
> ***There were cost impacts associated with this decision too, since we will ship a significant proportion of these volumes out of our China facility meaning we will incur costs of VAT***. Last year, we exported very little volume out of China in Q1. But this year we have committed almost all of our China production for the quarter to customers outside the country.

78. On this news, the Company's share price fell $0.57, or over 4%, to close at $12.55 per share on February 12, 2019, on unusually heavy trading volume.

79. On February 18, 2019, Nemaska Lithium Inc. announced that it had terminated its multi-year supply agreement with Livent after negotiations to amend it had failed, stating: "***throughout the discussions with Livent, the Corporation has advised Livent that it might have no option but to terminate the Supply Agreement***," a right "***which the Supply Agreement expressly allows it to do***."

80. On May 8, 2019, the Company disclosed its first quarter 2019 financial results, missing analysts estimates for revenue and earnings. Moreover, the Company slashed its 2019 guidance. That same day, the Company held a conference call to discuss its financial results with analysts and investors. During the call, defendant Graves disclosed that changing global auto OEM standards requiring higher performance and safety requirements had resulted in a delay in customer purchases of Livent's lithium hydroxide:

> In recent conversations with a few of our large established cathode and battery customers, ***it is becoming increasingly clear that the current facilities being used to manufacture high-nickel cathodes will require additional investment in their processes to meet OEM demands. The result of making these investments is a***

> ***delay in large-scale production of high-nickel chemistries across several of our customers***.
>
> To offset the lower volumes of high-nickel cathodes and to improve short-term profitability during this transition, many of these established cathode manufacturers are increasing their production of older cathode chemistries. This has been further reinforced by the changes to incentive structures in China, which has created a window in 2019 for producers of these existing chemistries to delay the introduction of next-generation cathode materials.
>
> However, many of these older chemistries can use either lithium carbonate or lithium hydroxide. As a result of the lower performance requirements in these applications, higher performance lithium hydroxide, such as that sold by Livent, does not generate the same price premium as in high-nickel applications and, today, is priced relative to the lithium carbonate equivalent. This is consistent with pricing patterns we've seen in these applications historically.
>
> * * *
>
> ***I stated earlier that some of our contracted lithium hydroxide customers are delaying their purchases of hydroxide from us as they suspend production of their high-nickel cathode materials while they make additional investments in their existing processes. This delay means that we will have excess hydroxide volumes available in the quarter that will not be sold under existing contracts and will instead likely be sold in the shorter-term arrangements, primarily in China***.

81. During that same conference call defendant Graves confirmed that the large low-priced lithium hydroxide contract referenced above in ¶77 had affected the customer mix during first quarter 2019 and this customer "continues to seek the delivery of more of its committed volumes from Livent in the first half of the year."

82. Regarding 2019 guidance, defendant Graves stated: "We now expect full year revenue of $435 million to $475 million, essentially flat with 2018. Adjusted EBITDA will be between $125 and $145 million, ***reflecting lower average realized prices for lithium hydroxide and lithium carbonate as well as higher operating costs***." Defendant Graves added: "***Based on reduced demand for our high-performance lithium compounds from a number of our larger customers***, we have reduced our forecast for full year production and sales of lithium hydroxide by roughly 2,000

tons," and that "***[t]he largest drivers of the hydroxide average price reduction are customer mix and lower sales prices on hydroxide sold in the short-term arrangements in China***."

83. On this news, the Company's share price fell $1.70, or nearly 16%, to close at $9.03 per share on May 8, 2019.

84. As of the commencement of this action, Livent stock was trading as low as $7.18 per share, a nearly 57% decline from the $17 per share IPO price.

**CLASS ACTION ALLEGATIONS**

85. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Livent securities issued in connection with the Company's IPO. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

86. The members of the Class are so numerous that joinder of all members is impracticable. Livent's common shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Livent common stock were traded publicly on the NYSE. Record owners and other members of the Class may be identified from records maintained by Livent or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

88. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

89. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the 1933 Act was violated by defendants' acts as alleged herein;

(b) whether the Registration Statement and statements made by defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operations, and prospects of Livent; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

90. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of §11 of the 1933 Act
### Against Livent, the Individual Defendants and the Underwriter Defendants

91. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

92. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against Livent, the Individual Defendants and the Underwriter Defendants.

93. This Cause of Action does not sound in fraud. Lead Plaintiffs do not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

94. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

95. Livent is the registrant for the IPO. As issuer of the common stock, Livent is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

96. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

97. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

98. By reasons of the conduct herein alleged, each defendant violated §11 of the 1933 Act.

99. Lead Plaintiffs purchased Livent shares pursuant and/or traceable to the Registration Statement for the IPO. Lead Plaintiffs and the Class have sustained damages. The value of Livent common stock has declined substantially subsequent to the IPO as a result of defendants' violations.

100. At the time of their purchases and acquisitions of Livent common stock pursuant to the Registration Statement, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiffs filed the complaint. Less than three years has

elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Lead Plaintiffs filed this complaint.

## COUNT II

### Violation of §12(a)(2) of the 1933 Act Against Livent and FMC

101. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

102. This Count is brought by Lead Plaintiff Central Laborers' Pension Fund pursuant to §12(a)(2) of the 1933 Act on behalf of the Class, against Livent and FMC.

103. The Registration Statement and the Prospectus incorporated therein contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above. Defendants owed Lead Plaintiff Central Laborers' Pension Fund and the other members of the Class who purchased Livent shares of common stock pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

104. Each of the defendants participated in the sale of Livent stock for financial gain by means of the Registration Statement.

105. Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement at the time Lead Plaintiffs acquired the Company's shares.

106. By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Lead Plaintiff Central Laborers' Pension

Fund and the other members of the Class who purchased Livent common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchase of Livent common stock. Accordingly, Lead Plaintiffs and the other members of the Class who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares of common stock seek damages to the extent permitted by law.

**COUNT III**

**Violation of §15 of the 1933 Act**
**Against Livent, the Individual Defendants and FMC**

107. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

108. This count is asserted against Livent, the Individual Defendants and FMC and is based upon §15 of the 1933 Act.

109. The Individual Defendants were each control persons of Livent by virtue of their positions as directors, senior officers and/or authorized representatives of Livent. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Livent and/or FMC. The Company controlled the Individual Defendants and all of its employees. FMC, meanwhile, controlled Livent and all of its employees before, during and after the IPO. FMC was the parent of Livent prior to the IPO, orchestrated the IPO in order to spin off the Company's assets, entered into numerous agreements with the Company that allowed it to continue to exert influence over the Company, and was Livent's controlling shareholder before, during and after the IPO.

110. Defendants had a financial interest in taking the Company's stock public, as alleged herein. And they were each critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the

IPO, and by having otherwise directed through their authority the processes leading to execution of the IPO as executives and/or directors of Livent and FMC.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives and Lead Plaintiffs' counsel as class counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

DATED: October 3, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
LAURIE L. LARGENT
JENNIFER N. CARINGAL

s/ LAURIE L. LARGENT
LAURIE L. LARGENT (validation code LLL7444)

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
jcaringal@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL (MSH 2062)
230 Old Lancaster Road, Suite B
Merion Station, PA 19066
Telephone: 610/660-8000
610/660-8080 (fax)
mhenzel@henzellaw.com

Local Counsel

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL 62702
Telephone: 217/544-1771
217/544-9894 (fax)

Additional Counsel for Lead Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on October 17, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: Llargent@rgrdlaw.com