**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | **CIVIL ACTION** |
| **BISSER NIKOLOV,** | : | |
| **Individually and on Behalf of All Others** | : | |
| **Similarly Situated** | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 19-2218** |
| | : | |
| **LIVENT CORPORATION, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM**

Lead Plaintiffs, Central Laborers' Pension Fund and New York Hotel Trades Council &

Hotel Association of New York City, Inc. Pension Fund, on behalf of themselves and all others

similarly situated (collectively "Plaintiffs") filed this securities class action suit against Livent

Corporation ("Livent"), its officers and directors (the "Individual Defendants"), the underwriters

of Livent's Initial Public Offering (the "Underwriter Defendants"), and Livent's controlling

shareholder, FMC Corporation ("FMC") (collectively "Defendants"), alleging violations of §§

11, 12, and 15 of the Securities Act of 1933.[1]  Plaintiffs allege in the Corrected Consolidated

Amended Complaint (the "Complaint") that Defendants made false and misleading statements

and omissions in the registration statement and prospectus filed with the Securities and Exchange

Commission ("SEC") in connection with Livent's October 2018 initial public offering ("IPO").

*See generally* ECF No. 44.  Defendants filed a joint motion to dismiss this action pursuant to

---

[1] Plaintiffs assert Count I, violation of Section 11, against Livent, the Individual Defendants and the Underwriter Defendants.  ECF No. 44 at ¶ 91-100.  Plaintiffs assert Count II, violation of Section 12(a)(2) against Livent and FMC.  *Id.* at ¶¶ 101-106. Plaintiffs assert Count III, violation of Section 15, against Livent, the Individual Defendants, and FMC.  *Id.* at ¶¶ 107-110.

Fed. R. Civ. P. 12(b)(6).[2]  ECF No. 50.  Plaintiffs filed a response in opposition to Defendants'

Motion to Dismiss.  ECF No. 51.  Defendants then filed a reply in support of their Motion to

Dismiss.  ECF No. 52.  On May 5, 2020, the Court held oral argument on the Motion to Dismiss

via video conference, in which both Plaintiffs and Defendants participated.  ECF Nos. 56, 57.

## I.  STANDARD OF REVIEW

When reviewing a motion to dismiss, the Court "accept[s] as true all allegations in

plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and [the

court] construes them in a light most favorable to the non-movant."  *Tatis v. Allied Interstate,*

*LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239,

262 n.27 (3d Cir. 2010)).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (quoting *Twombly*, 550 U.S. at 557)).  "The plausibility determination is 'a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense.'"

*Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at

679).

Finally, courts reviewing the sufficiency of a complaint must engage in a three-step

process.  First, the court "must 'take note of the elements [the] plaintiff must plead to state a

claim.'"  *Id.* at 787 (quoting *Iqbal*, 556 U.S. at 675) (alterations in original).  "Second, [the court]

---

[2] The Underwriter Defendants and Individual Defendants move only as to the claims asserted against them. ECF No. 50 at 11 n.1.

should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Third, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679) (alterations in original).

## II.   ELEMENTS PLAINTIFFS MUST PLEAD TO STATE A CLAIM

Plaintiffs allege the registration statement and prospectus Livent filed with the SEC in connection with its October 2018 IPO contained false and misleading statements and omissions, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  ECF No. 44.  The Securities Act of 1933 (the "Act"), 15 U.S.C. § 77a *et seq.*, protects investors by requiring that companies issuing securities provide financial and other significant information concerning the securities being offered for public sale.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015).  Companies offering securities for sale to the public, with a few exceptions, must file a registration statement and prospectus with the Securities and Exchange Commission with specific information about the company and the securities for sale.  *See* 15 U.S.C. §§ 77aa, 77f, 77j; *see also Omnicare*, 575 U.S. at 178. "Beyond those required disclosures, the issuer may include additional representations of either fact or opinion."  *Omnicare*, 575 U.S. at 178.

To establish a prima facie[3] violation of Section 11 of the Act, plaintiff "need only show a material misstatement or omission" in the issuing company's registration statement.  *Herman &*

---

[3] In evaluating a motion to dismiss, once the court has assumed the veracity of the well-pleaded allegations in the complaint, the court must "then determine whether they plausibly give rise to an entitlement to relief." *Connelly*, 809 F.3d at 787.  However, the Third Circuit has found that, "at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss." *Connelly*, 809 F.3d at 788. "A prima facie case is 'an evidentiary standard, not a pleading requirement.'" *Connelly*, 809 F.3d at 788 (quoting

*MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  Section "11 imposes liability 'if a registration statement, as of its effective date: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein not misleading.'"  *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782–83 (3d Cir. 2009) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006)).  Section 11 "does not require a showing of individualized loss causation, because injury and loss are presumed."  *In re Constar Int'l*, 585 F.3d at 785. Furthermore, "Section 11 imposes near-strict liability for untruths and omissions made in a registration statement."  *Obasi Inv. LTD v. Tibet Pharm., Inc*, 931 F.3d 179, 182 (3d Cir. 2019).

Similarly, "Section 12(a)(2) provides for civil liability for anyone who offers or sells a security 'by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . .'" *In re Suprema Specialties*, 438 F.3d at 269 (quoting 15 U.S.C. § 77l(a)(2)).  "To state a claim under Section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading 'prospectus or oral communication.'"  *In re Adams Golf Inc.*, 381 F.3d 267, 273 (2004).  "Like Section 11, Section 12(a)(2) is a 'virtually absolute' liability provision that does not require an allegation that defendants possessed scienter."  *In re Suprema Specialties*, 438 F.3d at 269 (quoting *In re Adams Golf*, 381 F.3d at 274 n.7).

---

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002)).  Instead, Plaintiffs must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [Plaintiff's] claims." *Connelly*, 809 F.3d at 789. Although Plaintiffs need not *establish* a prima facie case at this stage, the elements of the prima facie claim for violation of sections 11 and 12(a)(2) guide the Court in its analysis of determining whether the well-pleaded allegations plausibly give rise to an entitlement of relief.

In order for an omission to constitute a "violation[] of sections 11 and 12(a)(2), plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading." *In re Adams Golf*, 381 F.3d at 277 (citing 15 U.S.C. §§ 77k(a), 77*l*). Section 11's omissions clause creates liability for a statement of opinion where "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and . . . those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. Furthermore, a "reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading." *Id*. at 190-191.

In addition, "[m]ateriality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Adams*, 381 F.3d at 274 (citing *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997)). "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id*. (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir.1992)).

Lastly, "Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12." *In re Suprema Specialties*, 438 F.3d at 284 (citing 15 U.S.C. § 77o). Under Section 15, the "plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *Id*.

## III.  **WELL-PLED FACTUAL ALLEGATIONS**[4]

Livent is a pure-play miner and producer of lithium.  ECF No. 44 at ¶ 2.  Livent produces two types of lithium compounds: base lithium compounds, including lithium carbonate, and performance lithium compounds, including lithium hydroxide.  *Id*. at ¶¶ 37, 39.  Lithium hydroxide is used in the manufacturing of batteries for the electric vehicle ("EV") market.  *Id*. at ¶¶ 2, 37.

In October 2018, Livent filed a registration statement and prospectus (collectively the "Registration Statement") with the Securities and Exchange Commission in connection with its IPO.  ECF No. 44 at ¶¶ 1, 45, 46.  That same month, Livent completed its IPO, selling 23 million shares of its common stock at a price of $17.00 per share.  *Id*. at ¶¶ 4, 46.  The Complaint alleges that Livent received approximately $369 million from the IPO, net of underwriting discounts and commissions.  *Id*. at ¶ 46.  Prior to the IPO, Livent was a subsidiary of FMC.  *Id*. at ¶ 4.  Following the IPO, FMC retained approximately 84.25% of Livent's outstanding common stock.  *Id*. at ¶ 47.

The Complaint alleges that Livent's operations are centered in the Salar del Homre Muerto in Argentina, an area rich with lithium mineral depositions.  *Id*. at ¶ 39.  Plaintiffs allege the Registration Statement noted that "Livent's operations in Argentina were expandable, enabling Livent to increase its production of base lithium compounds to meet increasing demand."  *Id*.  Plaintiffs allege that base lithium carbonate sales make up 12% of Livent's

---

[4] When reviewing a motion to dismiss, the Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and [the court] construes them in a light most favorable to the non-movant."  *Tatis*, 882 F.3d at 426 (quoting *Sheridan*, 609 F.3d at 262 n.27).  These well-pled factual allegations, which the Court accepts as true for the purposes of the motion to dismiss, derive from Plaintiffs' Complaint and apply generally as background.  The Court will include the well-pled factual allegations from the Complaint that pertain to each particular claim as the Court discusses it.

revenues, but Livent uses almost all of the lithium carbonate it produces internally.  *Id*.  Plaintiffs further allege that the Registration Statement disclosed that Livent purchases lithium carbonate as raw material from other sources "from time to time" because "it has the operational flexibility to do so and it allows them to manage their production requirements and raw materials cost, thereby optimizing profitability for the Company."  *Id*. at ¶¶ 40, 52.  The Complaint alleges that Livent purchased 1.4 kMT (metric ton) of lithium carbonate from a third-party supplier in 2016 but did not purchase any lithium carbonate from a third-party supplier in 2017.  *Id*.

The Complaint alleges that Nemaska Lithium Shawinigan Transformation, Inc. ("Nemaska") is one of Livent's third-party suppliers of lithium carbonate.  *Id*. at ¶ 41.  Plaintiffs allege that, "[a]ccording to the Registration Statement, Livent entered into a long-term supply agreement with Nemaska in October 2016 wherein Nemaska would provide lithium carbonate to Livent from its electrochemical plant, which is under construction."  *Id*.  Under this agreement, Plaintiffs allege, Livent "prepaid" $10 million to Nemaska for lithium carbonate in April 2017, with supply to begin April 1, 2019.  *Id*.

Plaintiffs allege, "[a]ccording to the Registration Statement, Livent sells the majority of its products pursuant to long-term agreements at pre-negotiated prices" and that the "majority of its sales consist[] of performance lithium compounds."  *Id*. at ¶ 42.  Plaintiffs allege that, in 2017, more than 60% of the Company's revenue was generated from customers with long-term agreements of one to five years.  *Id*.  Plaintiffs allege that long-term customer agreements made up 58% of Livent's revenue for the first six months of 2018.  *Id*.

Plaintiffs further allege that a "substantial amount of Livent's total revenue comes from a small number of customers."  *Id*. at ¶ 43.  For example, Plaintiffs allege that, in 2017, one customer accounted for 14% of Livent's revenue and, for the first six months of 2018, a different

customer accounted for 10% of Livent's revenue.  *Id*.  Plaintiffs allege that Livent's revenue grew by 32% in 2017 and grew 51% in the first six months of 2018 as compared to the first six months of 2017.  *Id*. at ¶ 44.  Plaintiffs allege that the Registration Statement "touted Livent's 'highly profitable business.'"  *Id*.

## IV.  SECTION 11 AND 12(A)(2) CLAIMS

Plaintiffs allege that the Registration Statement "contained untrue statements of material facts or omitted to state other facts necessary to make the statements not misleading" in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933, including:

1. Shortages of Internally Produced Lithium Carbonate – That Livent was experiencing shortages of internally produced lithium carbonate, which resulted in Livent being unable to keep up with customer demand and production supply required for its lithium hydroxide production. Due to these shortages, Plaintiffs allege Livent was required to purchase higher volumes of lithium carbonate from third-party suppliers at higher costs, which negatively impacted Livent's revenues and margins.

2. Nemaska Agreement – That a dispute between Livent and Nemaska about a lithium carbonate supply agreement had not been resolved, and the agreement was about to be terminated, which caused Livent to pay higher prices for its raw materials, thereby impacting revenues and margins.

3. Unfavorable Long-Term Contracts – That Livent had entered into long-term contracts with its customers that contained pricing and volume terms that were not favorable to Livent and were negatively impacting the company.

4. <u>Decreased Demand for Lithium Compounds</u> – That demand and pricing for Livent's performance lithium compounds were weakening as Livent's larger customers were delaying purchases of these products and moving to production processes that used lower-priced lithium products.  The Complaint alleges that these conditions at the time of the IPO resulted in lower pricing for Livent's performance lithium compounds.

5. <u>Global Supply of Lithium Compounds</u> –That global supply of lithium compounds was growing faster than demand, which in turn was increasing competition and driving down lithium hydroxide prices in China.  The Complaint alleges that, as a result, Livent's customers in China were not willing to enter into long-term contracts with Livent and therefore Livent was unable to secure higher priced contracts with its Chinese customers.

6. <u>Risk Disclosures</u> – That the Registration Statement contained risk factors that failed to disclose and misrepresented significant risks the Company was facing at the time of Livent's IPO.

*See* ECF No. 44 at ¶¶ 48, 69.

Defendants do not challenge the materiality of these allegedly false or misleading statements or omissions for the purposes of the Motion to Dismiss.[5]  ECF No. 57 at 12. Therefore, the issue is whether Plaintiffs plausibly pled that Livent's Registration Statement contained (1) false or misleading statements **or** omitted facts either (2) that were required to be included by the securities laws or (3) whose absence rendered statements in the Registration

---

[5] To the extent Defendants infer a challenge to materiality as to certain claims, the Court decided those claims on another ground.  *See infra* n.8.

Statement misleading.  *In re Adams Golf*, 381 F.3d at 273-274, 277.  The Court will now

consider each of these conclusions that are not entitled to the assumption of truth in the order that

they were presented.

1.  <u>Shortages of Internally Produced Lithium Carbonate</u>

Plaintiffs first allege that Livent made statements in its Registration Statement that were

rendered misleading because Livent omitted to state that it was experiencing shortages of

internally produced lithium carbonate and would be required to purchase more lithium carbonate

from third-party suppliers at higher costs, impacting Livent's revenues and margins.  ECF No. 44

at ¶ 57(a).

Plaintiffs allege that Livent's low cost operations are based in its ability to source low

cost lithium carbonate from its mining operations in Argentina, which Livent uses to

manufacture lithium hydroxide, its most profitable performance lithium compound.  *Id*. at ¶ 49.

Plaintiffs allege that the Registration Statement "highlighted that Livent benefitted from" this

ability.  *Id*.  Regarding Livent's internally produced lithium, the Registration Statement stated:

> As a vertically integrated producer, we benefit from operating one
> of the lowest cost lithium mineral deposits in the world. We have
> been extracting lithium brine at our operations at the Salar del
> Hombre Muerto in Argentina for more than 20 years, and have been
> producing lithium compounds for over 60 years. . . . ***We source the
> majority of our base lithium compounds for use in the production
> of performance lithium compounds from these low cost operations
> in Argentina. Our operations in Argentina are expandable, giving
> us the ability to increase our lithium carbonate and lithium
> chloride production to meet increasing demand***. . . .
>
> [Livent's] lithium hydroxide operations were the lowest cost
> globally in 2017 [because] . . .[l]ithium hydroxide producers [such
> as Livent] with access to low cost lithium bearing feedstock
> generally have an advantaged cost structure compared to producers
> sourcing from third parties. In addition, brine producers generally

have a lower lithium hydroxide cost structure than hard rock mineral producers, due to their lower cost lithium carbonate feedstock. . . .

*Id*. at ¶¶ 49-50.

Plaintiffs allege that Livent highlighted in the Registration Statement that its low-cost position would allow it to expand production capacity for lithium carbonate and lithium hydroxide:

> In 2017 and for the six months ended June 30, 2018, we generated an Adjusted EBITDA margin of 36% and 45%, respectively. Our Adjusted EBITDA margin is a function of our low cost position. According to Roskill, in 2018 we operate the lowest cost lithium carbonate and lithium hydroxide operations globally. *We believe this leading cost position allows our company to operate profitably across varying market conditions. The low-cost position we enjoy means that we can continue to invest in expanding our production capacity as demand grows and have confidence that we will generate attractive financial returns on our investments*.

> *Id*. at ¶ 51.

However, Plaintiffs allege that the Registration Statement stated that "from time to time" Livent purchased lithium carbonate from other sources.  *Id*. at ¶ 52.  Plaintiffs further allege that the Registration Statement asserted Livent had "operational flexibility to procure lithium carbonate from third party suppliers as raw materials," which allowed Livent "to manage our production requirements and raw material cost, creating opportunities to optimize profitability." *Id*. at ¶ 52.  Plaintiffs allege that the Registration Statement stated that Livent "did not purchase any lithium carbonate in 2017 from third-party suppliers," but it also stated that Livent purchased 1.4 kMT (metric ton) of lithium carbonate from third-party suppliers in 2016.  *Id*. at ¶¶ 40, 52. The Complaint alleges that during Livent's IPO roadshow, "Livent executives assured investors that the Company would not be short lithium carbonate in 2019."  *Id*. at ¶ 52.

The Complaint alleges that the Registration Statement further discussed Livent's intent to fully capitalize on the growing EV market by planning expansions for its internal production of lithium carbonate and lithium hydroxide, in stating:

> In May 2016, we announced plans to increase our lithium hydroxide capacity to 30 kMT by the end of 2019. In February 2018, we announced our intention to expand our lithium hydroxide capacity to approximately 55 kMT by the end of 2025 at multiple locations. These expansions should ensure we have the capacity to meet customer demands globally, as they expand their own production networks around the globe.
>
> **In addition, to support our lithium hydroxide expansion, we have announced plans to expand lithium carbonate production in Argentina from 15 kMT in 2017 to at least 60 kMT by the end of 2025, in four separate stages. We expect to consume substantially all of any incremental lithium carbonate produced internally or sourced externally in our lithium hydroxide operations.**
>
> *Id*. at ¶ 55.

Plaintiffs further allege that at Livent's IPO roadshow presentation, Livent displayed a slide detailing four separate stages of Livent's production expansion plans between 2018 until 2025. *Id*.

The Complaint alleges that because Livent had underinvested in lithium carbonate production capacity, Livent was "not on track to meet its lithium carbonate production plans" at the time of the IPO. *Id*. at ¶ 57(a).   Despite not being on track, Plaintiffs allege, Livent "continue[d] to supply a number of its lithium customers with" its internally produced carbonate, resulting in "insufficient feedstock" for Livent's own lithium hydroxide production.  *Id*. Plaintiffs allege that Livent was then forced to purchase more lithium carbonate from third-party suppliers at higher costs, negatively impacting Livent's revenues and margins.  *Id*. at ¶ 57(b). Plaintiffs allege that because Livent omitted to state that it "was experiencing shortages of

internally produced lithium," these statements from the Registration Statement and the IPO roadshow were rendered false and misleading.  *Id*. at ¶ 57(a).

Defendants contend that Plaintiffs' claims related to alleged shortages of internally produced lithium should be dismissed either because (1) Plaintiffs failed to identify any statement that was rendered misleading by omitting this alleged information or (2) the Complaint does not allege that this purportedly undisclosed need to purchase lithium carbonate from third-party sources existed at the time of the IPO.  ECF No. 50 at 21-25.

Specifically, Defendants note that the Registration Statement made no representation regarding the exact levels of lithium carbonate Livent would produce from its internal production in any particular period.  *Id*. at 22.  Furthermore, Defendants contend that the Registration Statement never represented that Livent would source only from its internal operations in 2019. *Id*. at 23.  Defendants contend that the Registration Statement explicitly stated that from "time to time" Livent purchased lithium carbonate from third parties and asserted that Livent "continue[s] to pursue additional sources of lithium carbonate, which may include . . . entering into long-term supply agreements with other producers."  *Id*. (quoting Livent Corp., Registration Statement (Form S-1) 7, 89 (October 1, 2018)) (alteration in original).

Additionally, Defendants contend that Plaintiffs do not plead that the allegedly undisclosed need to purchase lithium carbonate from third-party suppliers existed at the time of the IPO, which Defendants assert is required for an alleged omission to be actionable.  *Id*. at 24 (citing *Underland v. Alter*, 2011 WL 4017908, at *5 (E.D. Pa. Sept. 9, 2011); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009)).  Defendants contend that Plaintiffs' allegations that Livent needed to purchase lithium carbonate from third-party suppliers are based on a February 2019 earnings call in which Livent stated that it experienced reduced production

volumes as a result of weather issues in Argentina in January 2019, months after the IPO.  *Id*. at 24-25.  Therefore, Defendants contend this need for additional lithium carbonate from third-party suppliers did not exist at the time of the IPO and is not actionable.  *Id*.

Plaintiffs respond that they "are ***not*** claiming that Livent failed to disclose that the Company sourced lithium carbonate from third-party suppliers or that it would only use internally produced carbonate for hydroxide production."  ECF No. 51 at 18 (citing ECF No. 50 at 11).  Plaintiffs contend that the Registration Statement was misleading because Livent did not disclose that it was experiencing a "host of internal issues that were impacting its supply of low-cost carbonate," which created a risk that Livent would need to source carbonate from third-party suppliers, at a higher cost.  *Id*.  Plaintiffs contend that stating Livent would purchase "lithium carbonate from 'time to time' for purposes of optimizing profits" is insufficient.  *Id*. at 19.  Instead, Plaintiffs contend the Registration Statement should have stated "that Livent was experiencing shortages of its low-cost lithium due to operational issues, which created a material risk that Livent would have to make significant purchases of carbonate from third-party suppliers at higher prices."  *Id*.  Because the Registration Statement highlighted Livent's low-cost position due to its low-cost lithium carbonate, Plaintiffs contend "if there were shortages, a reasonable investor would want to know how the Company would be financially impacted."  *Id*.

Plaintiffs further contend that the Registration Statement emphasized Livent's "ability to expand its lithium carbonate production to meet future demand," even though Livent had underinvested in its lithium carbonate production capacity and was not on track with its expansion plans.  *Id*. at 20.  Lastly, Plaintiffs contend that Livent's claim that "significant weather issues" affected their carbonate production volumes is an issue of fact inappropriate for determination at the motion to dismiss stage.  *Id*. at 20-21.

First, Plaintiffs have not alleged in their Complaint, as they state in their opposition brief, that Defendants were experiencing either a "host of internal issues" nor "operational issues," which resulted in shortages of their supply of low-cost carbonate.  The Complaint alleges only that Livent was "experiencing shortages of internally produced lithium carbonate" and that Livent "had insufficient feedstock for the Company's production of lithium hydroxide."  ECF No. 44 at ¶ 57(a).  Plaintiffs may not amend their Complaint in their response to Defendant's Motion to Dismiss to add that the shortage of lithium carbonate was due to internal or operational issues present at the time of the IPO, when the Complaint alleges simply that the shortages existed.  *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal citations omitted).  Therefore, the Court will not consider these new allegations.[6]  However, even if Plaintiffs had included allegations that Livent had internal or operational issues in their Complaint, the Court would consider these conclusory allegations in the context of argument but certainly not as well-pled facts.

Second, Plaintiffs have failed to plausibly state that any of the statements in the Registration Statement were rendered misleading by Plaintiffs' allegations that Livent omitted that it was experiencing shortages of internally produced lithium carbonate.  Though Plaintiffs allege that Livent had an "insufficient" supply of internally produced, low-cost carbonate at the

---

[6] Plaintiffs also allege in the Complaint that Livent underinvested in its lithium carbonate production capacity to support its claim that Livent was experiencing shortages of internally produced lithium carbonate.  ECF No. 44 at ¶ 57(a).  In Plaintiffs' brief in opposition to Defendants' Motion to Dismiss, Plaintiffs claim that "[w]hile the IPO roadshow material showed lithium carbonate capacity at 22kMT by the end of 2018, less than 30 days after the IPO, the Company disclosed that its 2018 estimated lithium carbonate capacity would drop to 18kMT."  ECF No. 51 at 20.  To the extent Plaintiffs now seek to state a separate claim that Livent's statements regarding its lithium carbonate production capacity were rendered misleading by Plaintiffs' allegations that Livent underinvested in this area, this claim is similarly not present in the Complaint and may not be added by Plaintiffs' brief in opposition. *See PepsiCo*, 836 F.2d at 181; *see also* ECF No. 52 at 3 n.2.

time of the IPO, Plaintiffs do not specify what it means that the supply was insufficient, except that it meant Livent purchased *some* lithium carbonate from third-party suppliers.  ECF No. 44 at ¶ 57(a).  In stating, "[w]e source the ***majority*** of our base lithium compounds for use in the production of performance lithium compounds from these low cost operations in Argentina," and "[o]ur operations in Argentina are ***expandable***, giving us the ability to increase our lithium carbonate and lithium chloride production to meet increasing demand," Livent does not make any representation as to any exact levels of its internal lithium carbonate production, nor the exact levels of lithium carbonate that Livent reserves for its own production of lithium hydroxide.  Livent Corp., Registration Statement (Form S-1) 3 (October 1, 2018) (emphasis added).[7]  Nor have Plaintiffs alleged that Livent did not ultimately source the "majority" of its lithium carbonate for performance lithium compounds from its operations in Argentina or that those operations were not expandable.  Therefore, Plaintiffs have failed to plausibly plead that the alleged omissions have rendered these statements false or misleading.

Similarly, it is not misleading to state that lithium hydroxide producers with access to low cost lithium bearing feedstock "generally have an advantaged cost structure" compared with those who source from third parties.  Livent Corp., Registration Statement (Form S-1) 80 (October 1, 2018).  Simply, access to low-cost feedstock will "generally" make lithium hydroxide production less expensive.  Whether Livent had insufficient feedstock does not have an effect on this statement of fact.

---

[7] Although "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings[,] . . .  an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216–17 (1st Cir. 1996)) (internal citations omitted) (alterations in original).  As the Registration Statement is integral to and explicitly relied upon in the Complaint, the Court may properly consider the contents of the Registration Statement.  *See* Livent Corp., Registration Statement (Form S-1) (October 1, 2018).

In the same vein, Livent's statement that its "low-cost position . . . means that we can continue to invest in expanding our production capacity as demand grows and have confidence that we will generate attractive financial returns on our investments" is not misleading because it speaks only to how Livent's ability to source lithium carbonate from its operations in Argentina gives it certain advantages.  Livent Corp., Registration Statement (Form S-1) 87 (October 1, 2018).  Livent's low-cost position does still allow Livent to continue to invest in expanding and give it confidence that it will generate attractive financial returns as compared to a lithium hydroxide producer without similar low-cost operations.

Furthermore, whether the alleged omissions make Livent's statement of opinion concerning its "leading cost position," which Livent believed would allow it "to operate profitably across varying market conditions," ECF No. 44 at ¶ 51, misleading "depends on context." *Omnicare*, 575 U.S. at 190.   While investors do not "expect opinions contained in those statements to reflect baseless, off-the-cuff judgments," investors must read statements of both fact and opinion "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the relevant industry." *Id*.  "[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Id*. at 194.  Furthermore, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*.

Here, Plaintiffs' allegations that Livent was experiencing lithium carbonate shortages at the time of the IPO is not sufficient to call into question Livent's basis for its opinion about its

"leading cost position."  Read in context, Livent first states that "[a]ccording to Roskill, in 2018 we operated the lowest cost lithium carbonate . . . operations globally."  Livent Corp., Registration Statement (Form S-1) 87 (October 1, 2018).  Livent next states that, because of this, Livent believes it is able to "operate profitably across varying market conditions."  *Id*.  A reasonable investor would read this statement of opinion to mean that, as Livent has access to internally produced lithium carbonate at low cost, it could remain profitable even when the price of lithium carbonate fluctuated.  This is true even assuming Livent was experiencing lithium carbonate shortages, because it is in comparison to those companies without access to internally produced lithium carbonate.  Plaintiffs have therefore failed to "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare*, 575 U.S. at 194.

Finally, Plaintiffs plead vaguely that "during the Company's IPO roadshow, Livent executives assured investors that the Company would not be short lithium carbonate in 2019."  ECF No. 44 at ¶ 52.  Plaintiffs fail to plead specifically what was said or written, nor have they provided any context for this alleged assurance.  Therefore, Plaintiffs have failed to plead sufficient factual content for the Court to draw the reasonable inference that this statement was misleading in violation of Section 11 or 12(a)(2).  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Ultimately, Livent never represented it would exclusively source lithium carbonate from its internal operations, and in fact disclosed that it purchased lithium carbonate from third-party suppliers.  The Court therefore finds that Plaintiffs have failed to plausibly allege that any

statements in the Registration Statement were rendered false or misleading by Plaintiffs'

allegations that Livent was experiencing shortages of internally produced lithium carbonate.[8]

2. Nemaska Agreement

The Complaint next concludes that Livent's Registration Statement "misleadingly gave

the impression that the dispute over the supply agreement [with Nemaska] had been resolved at

the time of the IPO with the parties agreeing to an amended and restated agreement." ECF No.

44 at ¶ 54. Plaintiffs allege that, in 2016, Livent entered into a long-term supply agreement with

Nemaska to provide Livent with low-cost carbonate starting in April 2019 "to help support

Livent's lithium hydroxide production and expansion." *Id*. Yet, Plaintiffs allege, in July 2018,

"the parties were in dispute over the supply agreement." *Id*. The Complaint identifies the

following statements made in the Registration Statement as misleadingly giving the impression

the supply agreement dispute was resolved:

> In October 2016, we entered into a long-term supply agreement (the
> "Agreement") with Nemaska Lithium Shawinigan Transformation
> Inc. ("Nemaska"), a subsidiary of Nemaska Lithium Inc. based in
> Quebec, Canada. Pursuant to the Agreement, Nemaska is to provide
> lithium carbonate to us from an electrochemical plant that is under
> construction. Since completion of the project financing has
> significantly delayed the construction of its electrochemical plant,
> Nemaska has reported that it is not in position to start delivering
> lithium carbonate according to the schedule in the Agreement.
>
> To enforce our right to supply under the Agreement, in July 2018,
> we filed for arbitration before the International Chamber of
> Commerce (in accordance with the Agreement's terms). In an
> attempt to resolve the dispute, the parties have been actively
> negotiating a revised schedule as well as arrangements to see that
> (in spec) lithium carbonate be nonetheless supplied to us from

---

[8] As the Court has found that no statements in the Registration Statement were rendered misleading by
Plaintiffs' allegations that Livent failed to disclose it was experiencing shortages of internally produced lithium
carbonate, the Court need not consider Defendants' argument that the allegedly undisclosed need to purchase
lithium carbonate from third party suppliers did not exist at the time of the IPO nor whether that is required for the
alleged omission to be actionable. ECF No. 50 at 24.

> alternative sources under the responsibility of Nemaska, with a view
> to providing us with product while minimizing Nemaska's exposure
> until its electrochemical plant is in operation.
>
> ***On September 25, 2018, the parties agreed on the final wording of
> a draft amended and restated supply agreement and, accordingly,
> also agreed to suspend the arbitration process under the
> expectation that the parties will agree on arrangements regarding
> alternative supply sources in the very near future****. Id*.

Plaintiffs conclude, therefore, that the "dispute between the Company and Nemaska regarding the lithium carbonate supply agreement was not effectively resolved as represented in the Registration Statement, but instead the supply agreement was about to be terminated."  *Id*. at ¶ 57(c).  Plaintiffs further allege that Livent did not disclose that Nemaska had the right to "terminate the supply agreement," and that Nemaska had advised Livent it "might have no choice but to terminate the supply agreement," which would force Livent to "replace 8,000 MT per year of lithium carbonate at higher prices to meet its supply demand for the production of lithium hydroxide."  *Id*.  at ¶ 57(b)-(d).

Defendants contend, first, that the Registration Statement made clear that the parties agreed to the wording of a "draft" supply agreement and that the parties had suspended the arbitration process in the "expectation" that it would be resolved in the "very near future," without guaranteeing such a result.  ECF No. 50 at 25-26.  Second, Defendants contend that the Registration Statement also warned investors "there can be ***no assurance*** that ensuing negotiations regarding such alternative supply will lead to a mutually satisfactory result, that the parties will execute and render effective the amended and restated supply agreement, or that [Livent] will not recommence arbitration." *Id*. at 26 (quoting Livent Corp., Registration Statement (Form S-1) 92 (October 1, 2018)).  Defendants further contend that Livent had no

20

obligation to disclose specifically that Nemaska had advised Livent it "might have no choice but to terminate the supply agreement" nor that Nemaska had the right to do so. *Id*. at 26. Defendants contend that the Registration Statement clearly stated that construction of Nemaska's facilities was delayed and, as a result, any supply from Nemaska was speculative and contingent on the agreement or arbitration. *Id*.

Plaintiffs respond that the Registration Statement asserted the parties had agreed on the "final wording" and this misleadingly gave investors the impression the supply agreement dispute had been resolved. ECF No. 51 at 21. Furthermore, Plaintiffs contend that Livent failed to disclose that Nemaska had the unilateral right to terminate the agreement and that Nemaska had told Livent it "might have no choice but to terminate the" supply agreement. *Id*.

First, the simple statement that Livent and Nemaska had agreed on "final wording" of the supply agreement is insufficient to mislead a reasonable investor to believe that all of the issues between the parties had been resolved. Additionally, Livent explicitly cautioned investors that the dispute had not been resolved. Livent disclosed that the agreement was still a "draft" and specifically stated that there was "**no assurance** that ensuing negotiations regarding such alternative supply will lead to a mutually satisfactory result, that the parties will execute and render effective the amended and restated supply agreement, or that [Livent] will not recommence arbitration." Livent Corp., Registration Statement (Form S-1) 9 (October 1, 2018) (emphasis added). Reading the Registration Statement's "final wording" language in "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," a reasonable investor could not conclude that the supply agreement was "effectively resolved," as Livent explicitly disclosed that the supply agreement was not finalized and negotiations were ongoing. *Omnicare*, 575 U.S. at 190.

Second, Livent's alleged failure to disclose that Nemaska had advised Livent that it "might have no choice but to terminate the supply agreement," and that Nemaska had a right to do so does not render any affirmative statement misleading.  ECF No. 44 at ¶ 57(d).[9]  Livent had expressly disclosed that there were serious concerns about the two parties' ability to resolve the known issues.  Livent had further clarified that there were "no assurances" the parties would come to a "mutually satisfactory result" or that Livent would not "recommence arbitration." Livent Corp., Registration Statement (Form S-1) 9 (October 1, 2018).  Therefore, in light of Livent's numerous disclaimers, the additional information that Nemaska "might" have to terminate the agreement or that Nemaska had the right to do so does not make Livent's assertion that the parties had "agreed on the final wording of a draft agreement" misleading.  The Court finds that Plaintiffs have failed to plausibly state that the alleged omissions regarding the Nemaska supply agreement rendered any statement in the Registration Statement false or misleading.

3.  Unfavorable Long-Term Contracts

Plaintiffs next allege that the Registration Statement led investors to believe that the large number of its customers under long-term contracts insulated Livent from volatility and provided "meaningful visibility" into future revenue, but that Livent omitted certain material facts which render these statements misleading.  ECF No. 44 at ¶ 58.  Plaintiffs contend that these statements were misleading because (1) one of Livent's largest customer contracts was priced at a significantly lower rate than the other contracted customers, (2) the long-term contracts contained unfavorable pricing terms, (3) the customers under long-term contracts had the ability

---

[9] To the extent Defendants' contention that "Nemaska's supposed right to terminate the agreement added nothing" is construed as an argument challenging materiality, the Court need not consider it separately as it has found that Plaintiffs have not plausibly stated that any alleged omission regarding the Nemaska supply agreement rendered misleading any statement in the Registration Statement.  ECF No. 26 at 50.

to delay purchases and/or dictate volumes and so Livent was not insulated from pricing or

volume volatility and (4) the customers with long-term contracts were in fact delaying purchases,

resulting in Livent having to sell its excess lithium hydroxide under short term agreements,

which were subject to price volatility.  *Id*. at ¶ 60 (a), (b), (c), (d).

Specifically, Plaintiffs identify the follow statements in the Registration Statement as

rendered misleading:

> Our customers demand very specific product performance characteristics, particularly from our battery-grade lithium hydroxide and butyllithium. Our products require a high level of manufacturing and technical expertise and undergo a stringent prequalification process before they are sold to customers. Our customers rely on our products for their high performance. ***For many we are one of only a few suppliers of performance lithium compounds, as many of our customers are unable or unwilling to adjust to alternate supply sources that may jeopardize the functionality of their end products and processes***.
>
> In 2017, we sold our lithium products to approximately 400 customers in approximately 37 countries, and approximately 77% of our sales were to customers outside of the United States. ***One customer accounted for approximately 14% of our total revenue in 2017***. Our ten largest customers accounted in aggregate for approximately 45% of our revenue in 2017.
>
> *       *       *
>
> ***In 2017 and for the six months ended June 30, 2018, more than 60% and approximately 58%, respectively, of our revenue was generated from customers with whom we have long-term agreements with terms ranging from two to more than five years in length, including all sales to our largest customer and nine of our ten largest customers***. A significant portion of the remaining 2017 sales were to customers with whom our relationship has not changed materially during the past five years. BEV automakers and battery and cathode manufacturers consider secure supply of high performance battery-grade lithium hydroxide as critical to their future success. These agreements generally specify an annual minimum purchase commitment at either a set price (usually reset annually) in a given year or within a pre-negotiated price range. ***For instance, approximately 79% of our expected lithium hydroxide***

> ***production in 2019 is under contract, affording us meaningful***
> ***visibility into future production demand and revenue***.

*Id*. at ¶ 58.

Furthermore, Plaintiffs allege that the Registration Statement "emphasized that a

majority of the Company's future sales were secured with multi-year agreements" when it stated:

> We believe our consistent performance and our clear commitment
> to expanding production capacity have made us a preferred supplier
> in our target markets and have allowed us to secure multi-year
> supply agreements. ***In 2017 and for the six months ended June 30,***
> ***2018, more than 60% and approximately 58%, respectively, of our***
> ***revenue was generated from customers with whom we have long-***
> ***term agreements with terms ranging from two to more than five***
> ***years in length. Our customers consider securing long-term***
> ***committed supply of performance lithium compounds to be critical***
> ***to their future success***. As our production of lithium hydroxide
> increases, we expect the portion of our total revenue generated under
> multi-year agreements to increase. ***We expect that all of our***
> ***capacity expansions will be contracted with customers before we***
> ***commence production***.
> *Id*. at ¶ 59.

Defendants contend that Plaintiffs have failed to show that any statements in the

Registration Statement were rendered misleading by the alleged omissions.  ECF No. 50 at 27.

Defendants contend that the Registration Statement states only that Livent's long-term contracts

"***generally*** specify an ***annual*** purchase commitment" and did not indicate that "***every*** long-term

supply contract had a minimum annual commitment," nor that the "customers with contracts

subject to annual minimums were required to purchase lithium hydroxide at set times during the

year."  *Id*. at 27-28 (quoting Livent Corp., Registration Statement (Form S-1) 91 (October 1,

2018)).  Defendants contend that the statement in the Registration Statement regarding

"meaningful visibility" was not misleading since this statement did not guarantee any particular

level of demand or revenue.  *Id*.  Defendants further contend that the allegations that one of their

customer contracts was priced lower than others and that long-term contracts contained

unfavorable pricing terms does not make it misleading to state that "a large percentage of Livent's revenue came from long-term contracts." *Id*. at 29.

Plaintiffs respond that "statements in the Registration Statement were misleading by omission because they failed to disclose that Livent's customer contracts contained unfavorable terms that were negatively impacting Livent at the time of the IPO." ECF No. 51 at 23.  In reality, Plaintiffs contend, "Livent's pricing growth had declined dramatically before the IPO due to a 'longstanding contract' with lower prices." *Id*. at 24.  Plaintiffs contend that the Registration Statement touted these long-term contracts, including that "over 60% of Livent's revenues were secured by long-term contracts" for purchase of lithium hydroxide, which "le[d] investors to believe that Livent was insulated from such volatility." *Id*.

This Court finds that none of the statements identified by Plaintiffs in the Registration Statement were rendered false or misleading by Livent's alleged failure to disclose the unfavorable terms of its long-term customer contracts.  Plaintiffs' theory is that Livent misled investors into believing that Livent was insulated from volatility by touting their longstanding contracts, when Livent's pricing growth had allegedly declined because of these longstanding contracts.  However, the statements at issue, read in context, highlight these long-term contracts for their reflection on Livent as a "preferred supplier" and their ability to give Livent "meaningful visibility into future production demand and revenue."  Livent Corp., Registration Statement (Form S-1) 5, 91 (October 1, 2018).

A reasonable investor could not conclude that Livent was insulated from volatility simply because it had a number of long-term contracts.  For one, Livent did not state that *all* of its customers were under long-term contracts, and therefore a reasonable investor would have understood that revenue from the customers not under long-term contracts would still contribute

to price and revenue volatility.  Furthermore, Livent did not state that each long-term contract had an annual purchase commitment nor that the customers with annual purchase commitments were required to purchase the lithium carbonate at any specific point during the year.  Therefore, a reasonable investor would have understood that a certain level of volatility would still be expected and that customers with *annual* minimum purchase contracts could not provide month to month stability.

Furthermore, though Plaintiffs have not alleged a claim under, nor mentioned, Item 303 in their Complaint, Plaintiffs contended at oral argument that "Item 303 is relevant to defendants' statements concerning Livent's long-term contracts" because Livent "knew of a trend in price decline and negative customer mix in the quarter before the IPO" based on "the long-term contracts" that Livent had at a "much lower price point" and "that trend then continued into the next quarter, [which was] the quarter of the IPO."  ECF No. 57 at 58.[10]

Some courts have found that companies who have omitted information from their registration statement that is required under Item 303 may be liable under Section 11 as an omission "required to be stated therein." *Howard v. Arconic Inc.*, 395 F.Supp.3d 516, 567 (W.D. Pa. 2019) (finding that, because material omissions in a registration statement that are "required to be stated therein" are actionable under Section 11 and because "Registration Statements must

---

[10] Plaintiffs reference Item 303 in their response in opposition only in passing.  ECF No. 51 at 22. Plaintiffs contend, "[a]t the time of the IPO (and in the quarters following), Livent was experiencing a sharp decline in pricing growth as a result of these contracts, but this information, which would have been material to investors given the Registration Statement's claims, was not disclosed at the time of the IPO."  *Id.*  Following this conclusion, Plaintiffs cite *Underland v. Alter*, 2012 WL 2912330, at *3 (E.D. Pa. July 16, 2012), quoting in a parenthetical "Sections 11 and 12(a)(2) 'impose upon defendants the duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading.'"  *Id.* at 22-23.  Plaintiffs also cite *Underland*, 2012 WL 2912330, at *6, quoting in a parenthetical "Item 303 creates a duty to include in registration statements 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'"  *Id.* at 23. Plaintiffs do not further discuss Item 303 in this section.

comply with Regulation S-K," then "Item 303 information is 'required to be stated therein' and therefore must be disclosed."); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933."); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("[A]ny omission of facts 'required to be stated' under Item 303 will produce liability under Section 11."). "Item 303 requires a public company to affirmatively disclose . . . trends or uncertainties that are (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." *Howard*, 395 F. Supp at 567 (citing 17 C.F.R. § 229.303(a)(3)(ii)).

Plaintiffs have pleaded no factual content in their Complaint that could provide the basis for a violation of Section 11 or 12(a)(2) under Item 303 as to Livent's long-term contracts. Instead, Plaintiffs are now asking the Court to pull together from the Complaint "trends or uncertainties," when Plaintiffs did not plead allegations of any trend or uncertainty themselves. Plaintiffs have also not alleged sufficient factual content to show that Livent omitted to disclose that any trend or uncertainty was "presently known to management" or "reasonably likely to have material effects on the registrant's financial condition or results of operation." *Howard*, 395 F. Supp at 567 (citing 17 C.F.R. § 229.303(a)(3)(ii)).

Furthermore, Plaintiffs filed their Corrected Consolidated Amended Complaint on October 18, 2019. ECF No. 44. It has been eight months since that date, yet Plaintiffs have failed to amend or move to amend their Complaint to add a claim alleging a violation of Section 11 or 12(a)(2) under Item 303. As Plaintiffs failed to plead sufficient factual content that would allow the Court to draw the reasonable inference that Livent omitted required information under

Item 303, Plaintiffs have failed to establish a violation of Section 11 or 12(a)(2) based on Livent's failure to comply with Item 303.

Therefore, this Court finds that Plaintiffs have failed to plausibly plead that the alleged omissions regarding Livent's long-term customer contracts were required to be included by the securities laws or that their absence rendered statements in the prospectus misleading.[11]

### 4. Decreased Demand for Lithium Compounds

The Complaint next alleges that Livent omitted to state that, at the time of the IPO, Livent's customers who typically purchased battery-grade lithium at premium prices were in the process of upgrading their production processes and therefore were delaying production of product that contained Livent's battery-grade lithium.  ECF No. 44 at ¶ 65(a); ECF No. 51 at 25. Because these customers were delaying production, Plaintiffs allege, they were also delaying purchases from Livent.  ECF No. 44 at ¶ 65(a).  Plaintiffs contend that Livent failed to disclose that, because of this production delay, Livent had excess lithium hydroxide volumes that it was forced to sell at lower prices.  *Id*. at ¶ 65(b).  Finally, Plaintiffs allege that Livent failed to disclose that these customers were instead increasing production of "older cathode chemistries," and therefore prices for Livent's battery-grade lithium hydroxide were declining.  *Id*. at ¶ 65 (c).

Plaintiffs allege that the Registration Statement emphasized Livent was "seeing the benefits" of its business with performance lithium compounds, "where demand continues to grow and pricing trends across our portfolio remain favorable."  *Id*. at ¶ 61.  Plaintiffs allege that

---

[11] As the Court has found that Plaintiffs have failed to allege that the Registration Statement contains any false or misleading statements or actionable omissions in violation of Sections 11 or 12(a)(2) related to Livent's long-term contracts, the Court need not consider Defendants' argument that its statement regarding "meaningful visibility" was non-actionable puffery.  ECF No. 50 at 28.

the Company highlighted that it was taking advantage of the quickly growing EV market,

stating:

> ***Automotive original equipment manufacturers ("OEMs") have announced plans to introduce longer-range EV models using higher energy density batteries, and are increasingly doing so by moving to high nickel content cathode materials. This shift will increasingly require battery-grade lithium hydroxide in the production of cathode materials.***
>
> As an existing, proven global producer of battery-grade lithium hydroxide, ***we are well positioned to benefit from this expected increase in lithium demand from EV growth***. As one of the pioneers in the lithium industry, we have relationships throughout the lithium-ion battery value chain. Across the battery value chain, product performance requirements have continued to evolve since the first lithium- ion batteries were introduced in the early 1990's. ***We have developed our application and materials knowledge by working with our customers over time to produce performance lithium compounds which meet evolving customer needs***. *Id*. at ¶ 61.

Plaintiffs further contend that the Registration Statement stated that Livent would benefit

from the move by EV manufacturers to the use of products that required the performance lithium

compound Livent produced, asserting:

> ***The growth forecasted in the EV market has resulted in a significant increase in current and expected future demand for battery-grade lithium compounds. . . .***
>
> As EV adoption accelerates, ***we anticipate battery manufacturers will increasingly move to using high nickel content cathode materials in the manufacture of EV batteries***. High nickel content cathodes substantially improve the energy density of batteries, enabling longer driving ranges. Battery-grade lithium hydroxide is a critical component in the production of high nickel content cathode materials. According to Roskill, demand for battery-grade lithium hydroxide for use in EV applications is expected to grow at a CAGR of 44% through 2027, reaching 359 kMT when measured on a lithium carbonate equivalent ("LCE") basis.

> *As one of the leading producers of battery-grade lithium hydroxide for EV applications, we are well positioned to benefit from this growth.*
>
> *      *      *
>
> Our goal is to maintain a leading market share in battery-grade lithium hydroxide, butyllithium and high purity lithium metal. *For high nickel content cathode materials, we believe we are one of a small number of producers capable of consistently delivering battery-grade lithium compounds that meet performance standards demanded by our customers.*
> *Id*. at ¶ 62.

Plaintiffs further allege that the Registration Statement emphasized Livent's opportunities in the Asia Pacific Market, including China, where "over half of global demand for EVs existed at the time of the IPO," in stating:

> In recent years, the Asia Pacific region has become an important market for lithium and its influence on the global lithium products industry has been increasing. In 2017 and for the six months ended June 30, 2018, 59% and 62%, respectively, of our revenue was derived from sales to the Asia Pacific region. China currently comprises over half of global demand for EVs, and we expect demand for lithium products, particularly lithium hydroxide, will increase in the Asia Pacific region such that it remains the largest region in terms of consumption.
> *Id*. at ¶ 63.

Lastly, Plaintiffs allege that Livent emphasized that its "'deep customer relationships' positioned Livent to capitalize" on the EV trend and gave Livent insight into those customers' objectives:

> Our performance lithium compounds are frequently produced to meet specific customer application and performance requirements. We have developed our capabilities in producing performance lithium compounds through decades of interaction with our customers, and our products are key inputs into their production processes. *Our customer relationships provide us with first-hand insight into our customers' production objectives and future needs, which we in turn use to further develop our products*.
> *Id*. at ¶ 64.

Plaintiffs contend that these statements were false and misleading in light of Plaintiffs' allegations that the customers purchasing these performance lithium compounds were actually modifying their production processes and therefore delaying production of product that contained Livent's battery-grade lithium, which delayed their orders of Livent's performance lithium compounds, and created excess product that Livent was forced to sell at a lower price. *Id*. at ¶ 65(a).

Defendants contend that these omissions do not render any affirmative statements misleading because "[t]he fact that such producers delayed lithium hydroxide purchases in the interim does not contradict—and, indeed, is fully consistent with—the expectation that they 'will increasingly require battery-grade lithium hydroxide in the production of cathode materials.'" ECF No. 50 at 30 (citing ECF No. 44 at ¶ 61). Defendants additionally contend that the fact that certain customers were upgrading their production processes "says nothing of—and is certainly not inconsistent with—Livent's statements regarding expected long-term demand for lithium hydroxide in the Asia Pacific market." *Id*.

Defendants further contend that these alleged omissions do not contradict Livent's disclosure about its "first-hand insight" into customers' production objectives, and that, "in any event, is classic puffery and non-actionable." *Id*. at 31. Defendants contend that Livent made clear in its Registration Statement that the anticipated growth in high-nickel cathode materials was anticipated to occur over the next ten years by stating "demand for battery-grade lithium hydroxide for use in EV applications is expected to grow at a CAGR of 44% through 2027." *Id*.

Defendants further contend that FMC had already disclosed two months before the IPO that battery manufacturers were retooling their facilities and were continuing to use older battery technologies not reliant on lithium hydroxide. *Id*. Therefore, "Livent had no obligation to

disclose information that had already been disclosed." *Id*.  Lastly, Defendants contend that the Complaint fails to allege that Livent had been advised prior to the IPO of any "specific customer decision to delay lithium hydroxide purchases," and therefore this omission is not a violation of Section 11 or 12(a)(2) as a matter of law.  *Id*. at 32.

Plaintiffs respond that the Registration Statement did not make clear that the growth in high-nickel cathode materials was to occur over the next ten years because the Registration Statement stated "growth forecasted in the EV market has resulted in a significant increase in ***current*** and expected future demand for battery-grade lithium compounds."  ECF No. 51 at 25. (quoting ECF No. 44 at ¶ 62).   Furthermore, Plaintiffs contend that the Registration Statement stated that Livent's sales of lithium hydroxide in the South Pacific, including China "where over half of the global demand for EVs existed," had grown from 59% to 62% and made up almost 60% of Livent's lithium hydroxide sales at the time of the IPO.  *Id*.  Plaintiffs conclude that it would then have been "material to investors to know" that customers in China were actually shutting down their high-nickel content cathode productions, which would negatively impact demand for Livent's products.  *Id*.

Next, Plaintiffs dispute Defendants' claim that it had no obligation to disclose information about the retooling of facilities because this had already been disclosed in an earnings call two months before the IPO.  *Id*. at 25.  Plaintiffs state that Livent was still required to "disclose the facts necessary to make the statements concerning demand for its lithium hydroxide not misleading" under Section 11.  *Id*. at 25-26.  Plaintiffs additionally contend that this argument is a "truth-on-the-market defense," which is not appropriate for determination at this stage.  *Id*. at 26.  Furthermore, Plaintiffs contend that Defendants mischaracterize this

alleged earnings call disclosure because it was not disclosed in the context of demand for Livent's lithium hydroxide. *Id*.

Plaintiffs further contend that they were not required to allege Livent knew of any specific customers delaying lithium hydroxide purchases because Section 11 does not require Plaintiffs to allege that an omission or misstatement was known to the company at the time of the IPO. *Id*. at 26-27. (citing *In re Adams Golf*, 381 F.3d at 274 n.7). Finally, Plaintiffs state that Livent also had a duty to disclose these adverse events under Item 303(a)(3)(ii) because "these events, which defendants admittedly knew, would have an unfavorable impact on Livent's financial condition in the form of customer purchase delays, excess lithium hydroxide volumes that could not be sold under existing contracts and downward price pressure on Livent's lithium hydroxide." *Id*. at 28.

Plaintiffs' overarching theory is that Livent's statements regarding its expectation for increased demand for lithium hydroxide based on anticipated changes in the EV market were rendered misleading by Livent's failure to disclose that the lithium hydroxide customers were modifying and upgrading their production processes, which was causing delays in their purchases of lithium hydroxide from Livent.

Because most of the statements Plaintiffs allege were misleading concentrate exclusively on *future* growth and demand for lithium hydroxide from the EV market, Plaintiffs focus on Livent's use of the word "current" in the following sentence from the Registration Statement: "The growth forecasted in the EV market has resulted in a significant increase in **current** and expected future demand for battery-grade lithium compounds." ECF No. 51 at 25 (quoting Livent Corp., Registration Statement (Form S-1) 3 (October 1, 2018)). Plaintiffs point to this sentence as directly misleading investors to believe that demand for lithium hydroxide was going

to increase "right away," when actually Livent's customers were delaying purchasing lithium hydroxide from Livent and prices for lithium hydroxide were declining.  *Id*.

However, "an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information" as well as "the customs and practices of the relevant industry." *Omnicare*, 575 U.S. at 190.  Here, Livent made clear that the increased demand for lithium compounds in the EV market was forward-looking.  For example, the relevant section of the Registration Statement is titled "Our Market Opportunity" and begins by stating, "[t]he trend of vehicle electrification is ***expected*** to be a significant growth catalyst for lithium compounds ***over the next decade and into the future***."  Livent Corp., Registration Statement (Form S-1) 3 (October 1, 2018) (emphasis added).  The Registration Statement further qualifies that the increased demand is *anticipated*, by stating, "[t]his shift will ***increasingly*** require battery grade lithium hydroxide . . .," "[t]he growth ***forecasted*** in the EV market . . ., and "[a]s EV adoption ***accelerates***, we ***anticipate*** battery manufacturers will ***increasingly move*** to using high nickel content cathode materials . . ."  *Id*. (emphasis added).  Livent plainly states that it is "well positioned to benefit from this ***expected*** increase in lithium demand from EV ***growth***."  *Id*. (emphasis added).  As for the "Asia Pacific Market," Livent qualifies that it "***expect[s]*** demand for lithium products, particularly lithium hydroxide, ***will increase*** in the Asia Pacific region . . . ."  *Id*. at 65 (emphasis added).  The Registration Statement also repeatedly highlights that the growth in demand for battery-grade lithium compounds was expected to occur over a long period of time, describing the growth "through 2027" and "[i]n the long term."  *Id*. at 3.

Read in this context, Livent's statement, "[t]he growth forecasted in the EV market has resulted in a significant increase in current and expected future demand for battery-grade lithium

compounds," could not have led a reasonable investor to conclude that Livent was guaranteeing any immediate changes to demand based on the anticipated vehicle electrification developments. *Id*.  Nor does Livent's alleged omission that its EV customers were delaying purchases of lithium hydroxide render these statements false or misleading.  Livent plainly qualifies that the growth in demand for lithium hydroxide from EV customers was anticipated to occur over the next number of years.  Livent similarly highlighted its large percentage of revenue derived from sales to the Asia Pacific region in the context of how Livent expected to benefit from growth in the EV market.  This again was neither a promise of nor comment on any immediate change in demand for lithium hydroxide.

Plaintiffs, however, contend the Third Circuit's reasoning in *In re Adams Golf* supports their contention that Livent was required to disclose that its customers were temporarily shutting down production of their products that use lithium hydroxide to render affirmative statements not misleading.  ECF No. 51 at 27.  In *In re Adams Golf*, the Third Circuit considered whether it was misleading to state that the company "does not sell its products through price sensitive general discount warehouses," when the company had not disclosed that Costco was in unauthorized possession of its products.  381 F.3d at 277-278.  The Third Circuit concluded "[r]easonable minds could disagree" as to whether that omission rendered the statement misleading, since the company's statement "may have nevertheless led a reasonable investor to conclude that the selective distribution model was functioning properly, i.e., that this method was exclusive."  *Id*. Plaintiffs contend that this conclusion supports their position because the "Third Circuit reversed the district court's dismissal of plaintiff's gray market distribution claims even though the financial impact from the claims did not occur until after the initial public offering, finding that

defendants had a duty to disclose the gray market issue to make the statements in the registration statement not misleading." ECF No. 51 at 27 (citing *In re Adams Golf*, 381 F.3d at 271-72).

In *In re Adams Golf*, the issuing company made an affirmative statement about its selective distribution model at the present time, which directly conflicted with the fact that Costco was in unauthorized possession of its product.  *See generally In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267 (2004).  Here, that lithium hydroxide customers were upgrading their facilities and therefore delaying purchases of lithium hydroxide from Livent does not directly conflict with Livent's statements that it expected future growth in the EV market to translate into a higher demand for lithium hydroxide over the next ten years.  Therefore, the Third Circuit's holding in *In re Adams Golf* does not support Plaintiffs' position.

Lastly, Plaintiffs have provided no factual foundation in their Complaint that could provide the basis for a violation of Section 11 or 12(a)(2) under Item 303.  "Item 303 requires a public company to affirmatively disclose . . . trends or uncertainties that are (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Howard*, 395 F. Supp at 567 (citing 17 C.F.R. § 229.303(a)(3)(ii)).  Plaintiffs do not mention Item 303 nor its requirements in the Complaint.  Specifically, Plaintiffs fail to show that any trend or uncertainty related to lithium hydroxide customers delaying purchases was presently known to Livent's management or that it would have a material effect on Livent's financial condition or results of operation.  Furthermore, as stated previously, Plaintiffs have failed to amend or move to amend their Complaint in the eight months since filing it to add a claim alleging a violation of Section 11 or 12(a)(2) under Item 303.  Therefore, Plaintiffs failed to plausibly plead sufficient factual content that would allow the

Court to draw the reasonable inference that Livent did not comply with Item 303 in violation of Section 11 or 12(a)(2).

This Court finds that Plaintiffs have not plausibly stated that the alleged omissions regarding Livent's cathode and battery customers delaying purchases of lithium hydroxide from Livent render any statements in the Registration Statement misleading.[12]

5. Global Supply of Lithium Compounds

Plaintiffs next allege that Livent's Registration Statement contained false and misleading statements because Livent failed to disclose that the global supply of lithium compounds was growing faster than demand, which in turn was driving down prices of lithium hydroxide in China.  ECF No. 44 at ¶ 68.  Plaintiffs allege that, as a result of this increased global supply, Livent's customers in China were unwilling to enter into annual or multi-year contracts with Livent, and "the Company was unable to secure higher priced contracts with its Chinese customers."  Id.  Plaintiffs further allege that Livent's competitors were also expanding their operations, which put additional pricing pressure on the performance lithium compounds and "further impact[ed] Livent's ability to secure higher priced contracts with its Chinese customers."  Id. at ¶ 68.

Plaintiffs allege that, because Livent failed to state that global supply of lithium compounds was growing faster than demand, it was false and misleading for Livent to highlight in its Registration Statement its competitive advantage based on its "significant know-how and

---

[12] As the Court has found that Plaintiffs have failed to allege that the Registration Statement contains any false or misleading statements or actionable omissions in violation of Sections 11 or 12(a)(2) related to the decreased demand for lithium hydroxide, the Court need not consider Defendants' arguments that (1) its "first-hand insight" into customers' objectives was non-actionable puffery, (2) that it had already disclosed that battery manufacturers were retooling their facilities in an August 2018 earnings call and had no obligation to disclose information already disclosed nor (3) that Plaintiffs failed to plead that Livent had been advised prior to the IPO of any specific customer decision to delay lithium hydroxide purchases.  ECF No. 50 at 31-32.

experience in the lithium hydroxide . . . production processes and product applications." *Id.* ¶ 66. Plaintiffs allege it was also false and misleading to state that Livent was "one of a small number of producers capable of consistently delivering battery-grade lithium compounds that meet performance standards demanded by our customers." *Id.*

Plaintiffs further allege that omitting information on the global supply of lithium compounds rendered false or misleading Livent's statement that its goal was to "maintain a leading market share" in its performance lithium products and that:

> Most markets for lithium compounds are global, with significant growth occurring in Asia, driven primarily by the development and manufacture of lithium-ion batteries. The market for lithium compounds also faces some barriers to entry, including access to an adequate and stable supply of lithium, technical expertise and development lead time. According to Roskill, we are one of six producers, including SQM, Albemarle, Tianqi, Orocobre and Jiangxi Ganfeng Lithium, that accounted for approximately 85% of the global supply of lithium compounds as measured by LCE. Both Albemarle and SQM recently entered into agreements with Chilean regulators to expand their annual lithium extraction efforts in Chile by an additional 135 kMT by 2021 and by 72 kMT by 2019, respectively. Tianqi recently announced an intention to invest an additional $525 million to expand its refining capabilities with the goal of quadrupling its annual output of lithium carbonate by 2021. Orocobre has announced that it is increasing production from its brine source in Argentina. We expect additional capacity to be added by new and existing producers over time. We believe our lithium brines in Salar del Hombre Muerto, Argentina, considered by the industry to be one of the lowest cost source of lithium, provide us with a distinct competitive advantage against these current or future entrants.
>
> We compete by providing advanced technology, high product quality, reliability, quality customer and technical service, and by operating in a cost-efficient manner. We believe we are a leading provider of battery-grade lithium hydroxide in EV battery applications and of performance greases and benefit from low production costs and a history of efficient capital deployment. . . . We are the only producer of high purity lithium metal in the Western Hemisphere and enjoy competitive advantages from our vertically

> integrated manufacturing approach and low production costs. Our primary competitors within the lithium metal product category include Jiangxi Ganfeng Lithium and other Chinese producers.

> *Id*. at ¶ 67.

Defendants contend, first, that these allegedly omitted facts were actually disclosed in the Registration Statement.  ECF No. 50 at 33.  Defendants contend that Livent disclosed that its competitors were expanding their operations, by stating that "Albemarle and SQM had agreed with Chilean regulators to expand their extraction efforts, Tianqi had announced its intent to expand its refining capabilities, and Orocobre had reported that it was increasing production at its brine source." *Id*. at 33-34.  Defendants further contend that Livent disclosed as a "primary risk" that "volatility in the price for performance lithium compounds, caused by changes in worldwide supply and demand that certain market analysts have predicted may occur over the next seven years as a result of competitors' announced plans to increase production capacity, as declines in lithium prices could have a material adverse effect on our business, financial condition and results of operations."  Livent Corp., Registration Statement (Form S-1) 11 (October 1, 2018).

Additionally, Defendants contend that Plaintiffs failed to identify how any of the alleged omissions render any disclosure false or misleading, since none of the "competitive advantages" that Livent identified "raised any inference that Livent would be immune to pricing dynamics caused by supply outpacing demand, as a result of competitor expansions or otherwise."  ECF No. 50 at 33-34.  Defendants further contend that Livent disclosed that the price of performance lithium compounds would be affected by various factors, including "worldwide supply and demand," and the fact that "[s]ome of our competitors are larger than we are and may have

greater financial resources." *Id*. at 34.  Finally, Defendants contend these statements were "corporate puffery" and non-actionable, sincerely held statements of opinion. *Id*.

Plaintiffs respond that statements in the Registration Statement about Livent's competitive advantage "contradicted the reality of the situation and misled investors because at the time of the IPO, Livent did not in fact have a competitive advantage because of the increased supply of lithium compound, which increased competition and consequently impacted lithium hydroxide prices in China." ECF No. 51 at 29.  Furthermore, Plaintiffs contend it was misleading to "represent[] to investors that Livent 'could' be adversely impacted when at the time of the IPO, Livent already was in fact adversely impacted." *Id*.

Plaintiffs further contend that these statements are not merely corporate puffery because the "competitive advantages were illusory at the time of the IPO." *Id*. at 30.  Lastly, Plaintiffs contend that, even if the statements are considered opinions, "because at the time of the IPO an increased global supply of lithium compounds led to an increase in competition and a resulting impact on lithium hydroxide prices in China, defendants had no basis for their statements regarding Livent's competitive advantages." *Id*. at 31.

Plaintiffs' basic conclusion is that because the global supply of lithium was growing faster than demand, which was impacting Livent's ability to secure higher-priced contracts with its Chinese customers, Livent misled investors by touting its competitive advantage in producing and selling its performance lithium products.  However, Livent identified concrete reasons why it believed it had a competitive advantage, including its "significant know-how and experience in the lithium hydroxide" production processes, its status as "one of a small number of producers capable of consistently delivering battery-grade lithium compounds that meet performance

standards," and its low production costs.  ECF No. 44 at ¶¶ 66-67.  Plaintiffs fail to identify any omission that renders any of these reasons false or misleading.

Plaintiffs have also failed to show that the alleged omissions were actually omitted. Livent specifically disclosed that a "primary risk" to Livent's business and operation was the "volatility in the price for performance lithium compounds, caused by changes in worldwide supply and demand" and their "competitors' announced plans to increase production capacity," which "could have a material adverse effect" on the company. Livent Corp., Registration Statement (Form S-1) 11 (October 1, 2018).  Livent additionally disclosed in its Registration Statement, unambiguously, that its competitors were expanding their operations.  ECF No. 44 at ¶ 67.

None of Plaintiffs' allegations concerning the global supply of lithium or Livent's alleged inability to secure higher priced contracts with its Chinese customers contradict Livent's stated competitive advantages nor render any identified statement in the Registration Statement misleading.  Therefore, this Court finds that Plaintiffs failed to plausibly plead that Livent's statements regarding its competitive advantage were false or misleading and failed to plausibly to allege that any omissions regarding the global supply of lithium rendered any statement false or misleading in violation of Sections 11 or 12(a)(2).[13]

6.  Risk Disclosures

Lastly, Plaintiffs allege that the Registration Statement stated risk factors that "failed to disclose and misrepresented significant risks the Company was facing at the time of Livent's

---

[13] As the Court has found that Plaintiffs have failed to allege that the Registration Statement contains any false or misleading statements or actionable omissions in violation of Sections 11 or 12(a)(2) related to the global supply of lithium, the Court need not consider Defendants' argument that its statements regarding its "competitive advantages" were non-actionable corporate puffery and non-actionable sincerely held statements of opinion.  ECF No. 50 at 34.

IPO." ECF No. 44 at ¶ 69.  In support, Plaintiffs repeat each of the previous allegations, alleging that Livent stated the risks "could" occur, when in fact they had already materialized.  *Id*. at ¶¶ 69-72.  Defendants contend "[t]his claim is duplicative of the other omissions alleged in the Complaint . . . and fails for the same reasons." ECF No. 50 at 34.  Plaintiffs respond that, "[a]s discussed above . . . defendants are liable for several of their false and misleading risk disclosures because these risks had already materialized at the time of the IPO."  ECF No. 51 at 31.  As this Court has found that Plaintiffs have not plausibly stated a violation of Section 11 or 12(a)(2) for any of the previous claims, Plaintiffs' duplicative claim regarding risk disclosures fails for the same reasons.

Therefore, the Court finds that Plaintiffs have failed to plausibly state a claim for violation of either Section 11 or 12(a)(2) of the Act.  The Court dismisses Counts I and II of the Complaint.

## V.  <u>SECTION 15 CLAIM</u>

Lastly, Plaintiffs allege a violation of Section 15 of the Act, 15 U.S.C. § 77o, against Livent, the Individual Defendants, and FMC.  ECF No. 44 at ¶¶ 107-110.  "Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12." *In re Suprema Specialties*, 438 F.3d at 284.  Under Section 15, "plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws."  *Id. See also In re Adams Golf*, 381 F.2d at 273 n.3 ("A form of derivative liability, section 15 permits investors to recover, on a joint and several basis, from 'control persons' who would be otherwise liable under sections 11 and 12(a)(2).").

As this Court has found that Plaintiffs have not plausibly alleged a violation of Section 11 or 12(a)(2), Plaintiffs have also necessarily failed to plausibly allege that any "controlled person or entity committed a primary violation of the securities laws." *In re Suprema Specialties*, 438 F.3d at 284; *see also In re Adams Golf*, 381 F.2d at 273 n.4 ("[B]ecause the District Court dismissed the sections 11 and 12(a)(2) claims, it did not, nor need we, consider any issues related to control person liability.")  Therefore, the Court finds that Plaintiffs have failed to plausibly state a claim for violation of Section 15 of the Act.  The Court dismisses Count III of the Complaint.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, this Court grants Defendants' Motion to Dismiss and dismisses the Complaint in its entirety.  An appropriate order will follow.


Date:   July 2, 2020                       **BY THE COURT:**

                                           **/s/ Chad F. Kenney**
                                           _____
                                           **CHAD F. KENNEY, JUDGE**